COMITIS v. PARKERSON et al.

(Circuit Court, E. D. Louisiana. June 17, 1893.)

1. ALIENS—EXPATRIATION OF CITIZENS OF UNITED STATES.

The act of July 27, 1868, (15 Stat. 223,) entitled "An act concerning the rights of American citizens in foreign states," recites in its preamble that

"the right of expatriation is a natural and inherent right of all people;" but the provisions of the act apply only to persons expatriated from a foreign country by immigration into the United States and naturalization therein, and declares them entitled to the same protection abroad as is accorded to native-born citizens of the Union. *Held* that, even if the preamble be held to imply a recognition of the right of a citizen of the United States to expatriate himself therefrom, actual removal from the country, and the acquisition of a domicile elsewhere, are conditions precedent to such expatriation.

**2.** SAME—HUSBAND AND WIFE—CITIZENSHIP BY MARRIAGE.

Act Feb. 10, 1855, (10 Stat. 604; Rev. St. § 1994,) which provides that an alien woman, by marriage with a citizen, shall become a citizen, does not authorize any inference that congress intended to declare the converse, that a citizen woman, by marriage with an alien, should become an alien; nor will the principle that the domicile of the wife is controlled by that of the husband, obviate the necessity of an actual removal from the country of a citizen woman, married to an alien, in order to effect her expatriation, that statute not being a declaration of the general consequences of marriage, but being in furtherance of the uniform policy of the government of the United States to increase immigration by encouraging the naturalization of citizens.

**3.** SAME—EXPATRIATION—HOW PERMISSIBLE.

Expatriation can be effected only in accordance with law. Under our government, congress must be the source of that law.

**4.** SAME—CONDITIONS OF EXPATRIATION—IF POSSIBLE AT ALL.

If expatriation could under our constitution ever be implied, it must be in some manner assented to by congress, and the purpose to effect it must be manifested by some unequivocal act on the part of the citizen seeking expatriation. Both these conditions are wanting in this case.

**5.** SAME—WHAT CONSTITUTES ALIENAGE.

Plaintiff, a native citizen of Louisiana, married a native-born subject of Italy, who, prior thereto, had come to Louisiana, and engaged in business, without intending ever to return to Italy, though he was not naturalized. After her marriage, she and her husband, until his death, lived together in Louisiana, without any intention on the part of either to depart therefrom or ever to reside elsewhere, and she, after his death, continued to live there. *Held*, that she was not an alien, and hence the federal courts could have no jurisdiction on the ground of diverse citizenship of a suit by her against a citizen of Louisiana.

At Law. On plea to the jurisdiction. Action by Annie Comitis against W. S. Parkerson and others for the wrongful death of plaintiff's husband. For opinion on exceptions to the petition, see 50 Fed. Rep. 170. Plea sustained.

John Q. Flynn, for plaintiff.

E. A. O'Sullivan, City Atty., for defendant city of New Orleans.

H. C. Miller and Chas. F. Buck, for defendant W. S. Parkerson and others.

BILLINGS, District Judge. This case is submitted on a plea to the jurisdiction of the court. The defendants are citizens of Louisiana. The question is whether the plaintiff is an alien. The admitted facts are these: The plaintiff was a native-born citizen of the state of Louisiana. On the 30th day of July, in the year 1881, in Louisiana, she intermarried with Loretto Comitis, who was a native-born subject of the kingdom of Italy, and had several years previous to that time immigrated from Italy, and established his residence in New Orleans, where he engaged in business, and where

he, up to the time of his marriage, and he and his wife, after his marriage, continued to reside, it being at all times after his coming to Louisiana his purpose not to return to Italy to reside, but to continue to reside in Louisiana. After his death his wife continued to reside in Louisiana, and at no time had she the purpose to remove to Italy. The question may be generalized thus: Does a woman who was a citizen of the United States, who never intended to leave it, and never did leave it, become expatriated and become an alien by marriage with a man who had been a subject of Italy, but who, previous to his marriage, had settled in Louisiana, and had forever severed himself from Italy?

The arguments on both sides have conceded (what could hardly be denied) that the tie which binds together a government and its subjects or citizens, and which creates the reciprocal obligations of protection and obedience, can be dissolved only in such a mode as has the assent of both parties; that, so far as concerns the government, this assent must be expressly made, or must be inferred from the fundamental or statutory provisions by which the action of the government involved is regulated. A change of the allegiance due to the United States, a throwing of it off on the part of a citizen, involves on the part of the government an acquiescence from that department of government which, according to its constitution, must acquiesce in it; and, on the part of the citizen, the manifestation of the purpose to expatriate himself by some unequivocal act, which act must also be recognized by the government to be adequate for that purpose.

I shall consider the question in two aspects: First, has the government of the United States in any way authorized or sanctioned the withdrawal of the plaintiff's allegiance to itself? and, secondly, do the facts of the case show a purpose on the part of the plaintiff to withdraw and transfer her allegiance?

First, as to any authority or sanction of the government of the United States. There can be no doubt but that the department of government which, in the distribution of authority under the constitution, has power over the subject of naturalization, has it also over the subject of expatriation. The constitution is silent on the subject of expatriation; but article 1, § 8, par. 4, provides that "congress shall have power to establish a uniform rule of naturalization." Where the constitution is thus silent as to who can denationalize, that department which can nationalize must be held to have authority to expatriate. Since the decision of Chirac v. Chirac's Lessee, 2 Wheat. 260, 269, that power has been settled to be vested exclusively in congress.

Down to the act of July 27, 1868, the question of right of expatriation and its limitations had been considered by the supreme court of the United States in the following cases: The Santissima Trinidad, 7 Wheat. 283; Talbot v. Janson, 3 Dall. 133; Inglis v. Trustees, 3 Pet. 99; and Shanks v. Dupont, Id. 242. There is also an able exposition of the subject given by Chief Justice Elsworth in his opinion in the Case of Isaac Williams, 1 Tuck. Bl. Comm. pt. 1, Append. 436, cited in Murray v. The Charming Betsy, 2 Cranch,

82, note. The law established in these cases is thus summarized by Chancellor Kent, 2 Comm. marg. p. 49:

"The better opinion would seem to be that a citizen cannot renounce his allegiance to the United States without the permission of government, to be declared by law; and that, as there is no existing legislative regulation on the case, the rule of the English common law (perpetual allegiance) remains unaltered."

This doctrine upon the matter of expatriation was declared and reiterated and inflexibly maintained, notwithstanding congress had, from the year 1802, permitted an alien, in being naturalized in the United States, to abjure his native allegiance without any release of it from his former sovereign. The inconsistency of the theory of perpetual allegiance with the admission of foreigners to citizenship by requiring them simply to renounce for themselves all preceding allegiance was admitted by the supreme court in Shanks v. Dupont, supra, and by Judge Kent, but it was tacitly admitted by both the court and the commentator that no power could correct the inconsistency or deal with the subject save congress. Congress, on the 27th of July, 1868, (15 Stat. 223,) passed the act entitled "An act concerning the rights of American citizens in foreign states." It is to be observed that the act itself, as does its title, deals only with the protection of aliens by birth who have become citizens by naturalization. As to them, it declares it to be the determination of the United States to accord to them, when in foreign states, the same protection as is accorded to native-born citizens similarly situated. The whole scope and force of the act, when most liberally construed, even when expanded by the more general terms of the preamble, declares that naturalized citizens, having, according to the principles of our government, the same rights as native-born citizens, shall have by law the same protection abroad. As to whether allegiance can be acquired or lost by any other means than statutory naturalization is left by congress in precisely the same situation as it was before the passage of this act. During the year 1868, and since, five treaties have been entered into between the United States and foreign governments based upon this statute, in which the right of expatriation is dealt with, (which will be referred to hereafter;) and in all these treaties the right is confined, as is the statute, to that of citizens or subjects of our country who have become citizens or subjects of others by direct statutory naturalization. So that with reference to the question before the court the law is left where it was previous to the year 1868, and congress has made no law authorizing any implied renunciation of citizenship.

I think the conclusion might be rested here. But, even if congress, in the preamble to the act of 1868, had meant to declare that there might be expatriation effected in connection with other means than by naturalization abroad, the settled doctrine as to expatriation would prevent the plaintiff from being regarded as expatriated. Expatriation must be effected by removal from the country. It cannot be denied that whatever right of expatriation congress meant to declare by the act of 1868 is in the express lan-

guage of the preamble based entirely upon the inborn right to seek happiness by free removal from one country to another. It could not, therefore, have been intended by congress in that act that citizens should expatriate themselves, and remain permanently within the country. The right is limited to or conditioned upon actual removal, by the public writers. Puffendorf, in his Law of Nations, (Book 8, c. 11, § 2,) says:

"But now the usual way by which subjection ceases is when a man by permission of his own commonwealth voluntarily removes into another, and settles himself and his effects and the hopes of his fortune there."

And again, in section 3, he says:

"But then it must be observed that by removing in this place I understand the departing out of the dominions and territories of the commonwealth, and not the changing its authority, and continuing to live in its dominions."

Some light may be obtained upon the subject by considering the laws of the states before the adoption of the constitution. All were adverse to the right to expatriate save Virginia and Pennsylvania. I have not had access to the act of Pennsylvania. That of Virginia is given in Talbot v. Janson, 3 Dall. 136, note. The words of the law are these:

"Whensoever any citizen of this commonwealth shall, by deed in writing, under his hand and seal, executed in the presence of and subscribed by three witnesses, and by them, or two of them, proved in the general court, any district court, or the court of the county or corporation where he resides, or by open verbal declaration made in either of the said courts, to be by them entered of record, declare that he relinquishes the character of a citizen, and shall depart out of this commonwealth, such person shall, from the time of his departure, be considered as having exercised his right of expatriation, and shall thenceforth be deemed no citizen."

It will be seen from this statute that to effect the expatriation the citizens must make or have passed in a court of record a public declaration of his renunciation, but that, even after this had been done and recorded, the citizenship ceased not until from the time of the departure from the commonwealth. Whenever the subject has been referred to by the United States supreme court the same view has been taken. In The Santissima Trinidad, 7 Wheat. 283, Justice Story, at page 348, after declining to express an opinion upon the general question of the right of an American citizen, independently of the authority of a legislative act, to throw off his allegiance to his native country, adds:

"It is perfectly clear that that this cannot be done without a bona fide change of domicile."

The syllabus in Talbot v. Janson, 3 Dall. 133, as prepared by Justice Curtis in his decisions of the supreme court, (volume 1, p. 128,) states the doctrine of that case upon this point to be:

"If the right of expatriation exists, not only a renunciation of citizenship of the United States but actual removal for some lawful purpose and the acquisition of a domicile elsewhere are necessary to effect it."

See, also, The Dos Hermanos, 2 Wheat. 76; and page 98, where the court says that, even if Mr. Miller had been expatriated by his resumption of domicile in the United States, he became a "redintegrated citizen."

To the same effect is the doctrine of the five treaties above referred to. Those treaties were: A treaty with the North German Confederacy, (15 Stat. 615;) a treaty with Bavaria, (Id. 661;) a treaty with Wurttemberg, (16 Stat. 735;) with Hesse, (Id. 743;) and Ecuador, (18 Stat. 69.) These treaties, as has been remarked, reciprocally give effect to the naturalization of the citizens or subjects of either government in the country of the other. So dependent is this recognition of change of allegiance upon actual change of country that in each treaty there is the same article as to the effect to be given to a return to the native country animo manendi. For instance, in the treaty with the king of Prussia, (15 Stat. 616,) article 4 provides:

"If an American naturalized in North Germany renews his residence in the United States, without the intent to return to North Germany, he shall be held to have renounced his naturalization in North Germany."

Alsberry v. Hawkins, 9 Dana, 177, is one of the few American cases which, following the law of Virginia, the parent state of Kentucky, maintains the right of expatriation. But the court there held that expatriation must be actual; there must be a going forth from the country allegiance to which is surrendered.

My conclusion, therefore, is that from the utterances of the public writers, of the supreme court, and the provisions of the treaties, even if congress meant to imply that expatriation from the United States might be effected by means other than naturalization in a foreign country, it must have meant that it should be conditioned upon actual departure from the country.

It does not affect the conclusion that the domicile of the wife was controlled by that of the husband. Whether decided by her or by one whom she had authorized to decide for her, the fact of her residence here, with the purpose on the part of her husband and herself to remain here always, is, as it seems to me, both upon principle and authority, an insuperable obstacle in the way of her ceasing to be considered a citizen of the United States. Nor does it seem to me that the act of congress of February 10, 1855, (10 Stat. 604; Rev. St. § 1994,) which provides that an alien woman by marriage with a citizen shall become a citizen, authorizes any inference that congress meant to declare the converse, viz. that a citizen woman by marriage with an alien should become an alien. The law is in such well-considered and guarded terms as to forbid any extension of it by implication. The public policy of the United States on the subject of immigration has been based upon its interests. A continent was to be populated. Vast tracts of land were to be settled and occupied chiefly by foreigners. Therefore congress has uniformly encouraged and fostered the immigration and naturalization of foreigners in every proper way. Lynch v. Clarke, 1 Sandf. Ch. 657, and Chief Justice Elsworth's opinion in the Case of Isaac Williams, 2 Cranch, 82, note. Again, congress considered the investiture of an alien with the rights of citizenship as an advantage in the reception of which acquiescence might be presumed, which would be far from true as to the loss of those rights by a citizen. The relation of husband and wife was dealt

v.56f.no.8—36

with by congress only in the furtherance of this public policy of the nation, and the statute was not intended as a general enactment upon the consequences of marriage between people of different nationalities. Therefore, as it seems to me, if inference is to be resorted to upon the subject, the motive on the part of congress for making an alien woman a citizen by her marriage with a citizen would have been the very reason for its not intending the converse,—that a citizen woman by marrying an alien should become an alien.

The relation of husband and wife is not inconsistent with one being a citizen and the other being an alien. In Priest v. Cummings, 16 Wend. 616, 626, the supreme court of New York, Judge Nelson, afterwards Mr. Justice Nelson, being the organ of the court, held that in the act of congress, known as the "Naturalization Act," the words, "any alien being a free white person," included an alien married woman, and that an alien wife might be naturalized without the concurrence of her husband; Judge Nelson quoting from the opinion of Shanks v. Dupont, 3 Pet. 248, to the effect that "the incapacities of married women do not affect their political rights, nor prevent them from acquiring or losing a national character; that their political rights do not stand upon the doctrines of municipal law, but upon the more general principles of the law of nations." If the doctrines of international law and our own naturalization statute sanction a married woman becoming a citizen for herself and without the concurrence of her husband, how shall the fact of a woman's marriage with an alien-born husband, who has cast off forever all political connection with any country save this, and has settled here for life, work ipso facto an undeclared implied surrender of her citizenship? In Beck v. McGillis, 9 Barb. 35, it was held that the marriage of a female with an alien did not render her an alien, so as to prevent her taking real estate by dower.

I have so far considered the question submitted with reference to any assent on the part of the government to a renunciation of allegiance on the part of the plaintiff. Very much of what I have said bears upon the remaining point to be considered,—whether the plaintiff has herself done any act which, by fair intendment, manifested a purpose of voluntarily withdrawing her allegiance from the United States. The plaintiff is in this case claiming a privilege acquired, but the case must be determined upon precisely the same considerations as if the question arose upon an objection interposed against her claim of a right, such as if she was setting up a right of dower, and it was claimed she had become an alien. In either case the question would be the same,—has the plaintiff by her marriage with Comitis renounced her citizenship of the United States? According to the facts of the case, Comitis several years before the marriage settled here with a purpose to withdraw altogether from Italy, his native country, and never to leave this country, which purpose he retained till the time of his death. The plaintiff herself never left the country, and never intended to leave. The inference to be drawn from the plaintiff's

marriage with Comitis, under these circumstances, as it seems to me, is that the plaintiff meant to retain, and her husband ultimately to acquire, citizenship in the United States. According to the doctrine laid down by the English courts, especially by Sir William Scott, and reiterated by the United States supreme court in The Venus, 8 Cranch, 255, in case of a war between the United States and Italy, if Comitis (doing less than is shown to have been done by him in his case towards making this his permanent domicile) "had removed to this country, settled himself here, and engaged in the trade of the country, he would have furnished such evidence of an intention permanently to reside here as would have stamped him with the national character" of the United States. Page 279. I cannot see how, if these circumstances would have stamped upon him the national character with respect to his goods on the high seas, they should not be considered as stamping the same national character upon him as a husband in the opinion of the woman who was about to marry him, and thus furnish a clear indication of the intent on her part not to renounce the protection of the government of the country in which she and he intended to continue to reside. Both the husband and wife intended this country as their permanent domicile. By virtue of his settlement and residence here the constitution makes his children citizens of the United States. By reason of his settlement and residence here the courts adjudge his property, when outside of all countries, that of a citizen. If the controlling circumstances of a man's life render his children and his property American, can a union with him by marriage be held to indicate a purpose on the part of the wife to expatriate herself and render herself an Italian? If, even when renunciation of allegiance is permitted, express renunciation is not allowed except when accompanied by actual departure from the country, a fortiori, remaining and intending to remain in one's native country permanently forbid any withdrawal from allegiance by implication.

My conclusion, for the reasons which I have thus stated, is that on the questions of naturalization and expatriation the judgment of the courts must not outrun the action of congress, and that the courts must carefully observe the lines of demarcation which the congress has drawn; that any imperfections or inconsistencies in those lines must be supplied and corrected by congress, and not by the courts; and that the laws of congress do not authorize, nor do her own acts impute, any cessation of her citizenship of the United States. Four attorney generals of the United States have given opinions upon the question as to the effect of a female citizen marrying an alien husband. Two have held that she became an alien, two that she remained a citizen. One of the present justices of the supreme court, when he was district judge, whose every opinion has my great respect, due not more to his elevated position than to his commanding fitness for it, came to the opposite conclusion to that which I have reached. Pequignot v. Detroit, 16 Fed. Rep. 211. But in that case the facts characterizing the residence of the husband and wife may have made it what the public

writers term temporary residence, whereas the intent of the plaintiff and her husband was to remain in the United States always.

I think the plea must be maintained, and the suit dismissed without prejudice.