## RILEY v. HOWES, District Director of Immigration (two cases).

Circuit Court of Appeals, First Circuit. February 27, 1928.

Nos. 2161, 2162.

1. Aliens ⟨⟩54(7)—Burden of proving that person held for deportation, but claiming citizenship, is an alien, rests on the United States.

In proceeding for release of petitioner, held for deportation, but who claimed American citizenship, the burden of proving alienage *held* to rest on the government, there being no presumption against the claim of citizenship.

2. Aliens ⟨⟩54(9)—Evidence held not to support government's claim that person sought to be deported was an alien.

Evidence in proceeding for discharge of petitioner held for deportation *held* not to support the government's claim that he was an alien, but to be more consistent with his claim that his father was born in the United States and never expatriated himself, though he lived for a time in New Brunswick, while working in Maine.

Appeal from the District Court of the United States for the District of Maine; John A. Peters, Judge.

Petitions by Nelson G. Riley against Samuel H. Howes, District Director of Immigration for the Port of Portland, for writs of habeas corpus. From orders dismissing the writs, petitioner appeals. Reversed and remanded.

For opinions below, see 17 F.(2d) 646, 647.

John B. Merrill, of Bangor, Me., for appellant.

William B. Nulty, Asst. U. S. Atty., of Portland, Me. (Frederick R. Dyer, U. S. Atty., of Portland, Me., on the brief), for appellee.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. These two habeas corpus cases grow out of the gov-

ernment's attempt to deport the appellant as an alien unlawfully in the United States. Nelson G. Riley is now about 50 years old. He was born in New Brunswick, and first came to the United States about 30 years ago. For many years he was an undertaker and florist, and for some time in the shoe business. For some 15 years he lived in Milltown, N. B., and passed daily, several times, between his home and his place of business in Calais, Maine. He states that "all the money I ever earned in my life was on this side." In 1920 he, with his wife and six children, was formally admitted to the United States as a Canadian. Thereafter he made his home in Bangor, where he or his wife owned a substantial home and four of his children were in school. He and his wife together have property worth about $25,000.

In 1922 or 1923, he began to bring back, on his frequent trips to the Canadian side, liquor at the request of friends, because he "would be a good fellow and accommodate them." "From that start I gradually went into the bootlegging business on a larger scale. * * *" In 1922 and 1923 he twice paid fines in the federal court, pleading guilty to unlawful possession of liquor. In 1924 he was sentenced to 18 months at Atlanta for conspiracy to violate the National Prohibition Act (27 USCA). While in prison in 1925, the immigration authorities began proceedings to deport him, as "likely to become a public charge." Riley then testified that he was a citizen of Great Britain. After further proceedings, not now, in the view we take of the case, material, Riley discovered evidence that his father, Joseph Riley, was born in the United States, and therefore denied that he was an alien, liable to deportation as a person likely to become a public charge or because convicted of a felony (conspiracy, supra) involving moral turpitude, prior to his last entry, which consisted in walking across the bridge at Calais when out on bail granted in habeas corpus proceedings. Cf. 11 C. J. p. 779.

[1] The issue of appellant's citizenship was tried in the District Court (17 F.[2d] 647). It must be determined under the usual rules applicable in judicial procedure. Bilokumsky v. Tod, 263 U. S. 149, 153, 44 S. Ct. 54, 68 L. Ed. 221; Ng Fung Ho v. White, 259 U. S. 276, 281, 283, 42 S. Ct. 492, 66 L. Ed. 938.

The learned District Judge held that: "On the whole, the evidence is not sufficiently convincing that the older Riley was born in this country; but, if actually born in this country, the evidence would seem to be more consistent with expatriation than otherwise." Exactly what this means is not clear, particularly when taken in connection with the opening statement of this paragraph of the opinion: "We start with a very strong presumption, which must be overcome by Riley, that he is an alien." Of course Riley's statement, at the first hearing before the immigration official, that he was a citizen of Great Britain, called for explanation. Temporarily it supported the burden resting upon the government; but the burden of proof to show alienage was throughout on the government. Bilokumsky v. Tod, 263 U. S. 149, 153, 44 S. Ct. 54, 68 L. Ed. 221. It did not shift. There was no legal "presumption" against Riley's claim of citizenship. 2 C. J. p. 1045. To prevail, the government must show by a fair preponderance of the evidence either (1) that Joseph Riley was not born in the United States; or (2) that he expatriated himself before the appellant's birth in 1877 or 1878. [2] Careful study of the rather unsatisfactory evidence concerning the history of the Riley family constrains us to the conclusions that Joseph Riley was born in Long Island, N. Y., and that he did not expatriate himself. The clearest evidence as to his place of birth is given by his daughter and youngest child, Mrs. Ethel Eldridge, who remembers distinctly her father telling her that he was born in the States; that his father was a policeman in New York, who was killed when making an arrest. Appellant's brother testified that he had always heard their father was born in Long Island. Evidence of some weight and to the same effect came from a half-brother of Joseph, and from two old men connected by marriage. There was also credible evidence that when, in a dispute with his boss in the shipyard in Eastport, where Joseph Riley worked, he flung at the boss: "I was born in the United States; you were born in St. Andrews." There is no finding or intimation by the trial court, or indication in the evidence, that these witnesses were not honest and truthful.

The only evidence to the contrary, entitled to any weight whatever, is the record made when Joseph Riley was admitted to the Provincial Lunatic Asylum, August 18, 1903, in which his place of birth is given as "N. B."— New Brunswick. But this record was most likely made from data furnished by the physician in New Brunswick, who gave the medical certificate. Whatever its origin, it cannot fairly to held to control the explicit testimony of his daughter and others, supra. Several witnesses called by the government

failed utterly to support the government's theory of Joseph Riley's birth in New Brunswick.

The United States attorney recognizes that the weight of evidence is that Joseph Riley was born in the United States, and in effect grounds his case on the claim of expatriation. But here, also, the government fails. The United States attorney frankly concedes: "There is no definite evidence * * * that Riley's father expatriated himself." This falls little, if at all, short of conceding the appellant's case. State v. Jackson, 79 Vt. 504, 65 A. 657, 8 L. R. A. (N. S.) 1245, and note. This is a learned and exhaustive opinion, citing and reviewing many of the pertinent authorities. Cf. Talbot v. Janson, 3 Dall. 133, 161–165, 1 L. Ed. 540; Comitis v. Parkerson (C. C.) 56 F. 556, 22 L. R. A. 148; Ware v. Wisner (C. C.) 50 F. 310. Such evidence as there is bears against expatriation. Joseph Riley worked in the Eastport Navy Yard, and lived in Calais; when and how long is not clear. He was there injured, and he was insane for many years. He may have been incapable of forming the necessary intent to renounce his American citizenship. Hauenstein v. Lynham, 100 U. S. 483, 484, 25 L. Ed. 628. At any rate, we find no evidence that he ever had any such intent. Cf. 11 C. J. 784. His fling at his boss of his birth in the United States indicated a pride in his origin. His employment in the Navy Yard has some tendency to show his adherence to the rights of such citizenship. How long he lived in New Brunswick, sane or insane, does not appear; but one of the government's witnesses testified he "was on this side when he was taken sick," meaning that he became insane. This lends support to appellant's contention that his father was incapable of forming the necessary intent to change his citizenship when he left this country to live in Lynnfield, N. B. And his daughter, Mrs. Eldridge, who is but three years younger than the appellant, testifies that she does not remember her father as able to work; that she had a half-brother, now dead, who used to provide for the family. Appellant's brother remembers questioning his father as to why he did not vote in Canada.

Without further review of the evidence, we conclude that the government entirely failed to show alienage; that the fair preponderance of the evidence shows that the appellant was a citizen of the United States, and not subject to the jurisdiction of the Department of Labor.

The decrees of the District Court are reversed, and the cases remanded to that court for further proceedings not inconsistent with this opinion.