## MEYER v. UNITED STATES.
### No. 10647.

Circuit Court of Appeals, Fifth Circuit.

April 5, 1944.

Rehearing Denied May 2, 1944.

Bernard A. Golding and William M. Hatten, both of Houston, Tex., for appellant.

Miles L. Moss, of Houston, Tex., for appellee.

Before HUTCHESON, HOLMES, and LEE, Circuit Judges.

HUTCHESON, Circuit Judge.

From a judgment entered against him in a denaturalization proceeding[1] brought to cancel his certificate for fraud in its procurement, defendant has appealed. Born of war hysteria and ideological conflicts, this is another of those fortunately rare proceedings in which an un-American[1a] intolerance, of opinions not acceptable to the majority, puts our adherence to American constitutional principles not only of tolerance but of justice to the test lest, done mere lip service to, they become a byword and a hissing. In form it was a judicial inquiry begun in September, 1942, and concluded in February, 1943, into whether the defendant, a German born naturalized citizen, had, in 1935, more than seven years before, secured his citizenship by fraud and, therefore, illegally, and because thereof should have his certificate cancelled. Its result was to take his citizenship away (1) because, and only because of his frank assertion before December, 1941, of views which, though entertained and expressed by him at a time when millions of other American citizens, naturalized and native born, were entitled

---

[1] Section 338 of the Nationality Act of 1940, 8 U.S.C.A. § 738.

[1a] Compare Thomas Jefferson's: "I have sworn upon the altar of Almighty God eternal enmity to every form of tyranny over the human mind".

to, and did, express the same views, were regarded as incompatible with the oath of citizenship he took five years before and, therefore, as proof that he took the oath falsely and in fraud; and (2) because, as he had a statutory[2] right to do, he considered, and made inquiries in 1940 regarding, expatriating himself, though he did nothing to effectively carry this out,[3] and while the United States was still neutral, completely abandoned the idea.

The district judge's findings, conclusions and judgment were handed down before the Supreme Court had, in the Schneiderman case, Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796, authoritatively rejected the views acted on by some, but by no means all,[4] of the inferior federal judges, and never by the Supreme Court; that naturalized, unlike native born, citizens remain indefinitely under judicial tutelage; that because they are naturalized instead of native born citizens, their thoughts and speech are subject to a jealous surveillance, so that in effect their citizenship is held by a tenure no stronger than their ability from time to time to satisfy government inquisitors and judges that their views are, according to accepted formulas, safe and sound.

■ In assessing the adequacy, therefore, of the district judge's findings to support his ultimate conclusion, and in determining the validity of that conclusion itself, it must be borne in mind that the findings were not made, the conclusions were not drawn with the benefit and in the light of the correct principle the Schneiderman case reaffirmed. In short, they were not made in the light of the principle; that, native born and naturalized citizens, we are one people;[5] that United States district attorneys and United States judges are not given surveillance of, inquisitorial powers or suzerainty over, the souls and minds of foreign born citizens; and that citizenship once granted him, a naturalized citizen has the same freedom in thinking and speaking as a native born citizen has. They were made and announced in the light of the aberration from that principle as expressed in the decisions of district judges which the district judge below cited and relied on.[6] This aberration, substituting a rule without warrant in statute or authoritative decision, that the naturalized citizen is indefinitely on probation, refuses effect to the correct rule that, since what is under attack is a solemn judgment, of a court possessing and exercising the judicial power of the United States and having the benefit, in the exercise of that power, of expert assistance and advice expressly provided by Congress, entered upon full and exhaustive inquiry after the five years of statutory probation. have ended in a grant of citizenship, it may not be over-

[2] R.S. § 1999, 8 U.S.C.A. § 800; Cf. Secs. 801, 802.

[3] Comitis v. Parkerson, C.C., 56 F. 556, 558, 22 L.R.A. 148.

[4] Cf. United States v. Rovin, D.C., 12 F.2d 942; Rowan v. United States, 9 Cir., 18 F.2d 246; United States v. Sharrock, D.C., 276 F. 30. In United States v. Grenfeld, D.C.S.D.Tex., 34 F. 2d 349, 350, it was said:
" * * * unless from a consideration of the evidence fraud plainly appears, the certificate may not be cancelled, for what must be here determined is the state of mind of the defendant at the time he obtained his certificate, and, since the effort is to set aside a solemn judgment of a court, that evidence must clearly establish the existence of a fraud."

[5] "Except for eligibility to the Presidency, naturalized citizens stand on the same footing as do native-born citizens". United States v. Schwimmer, 279 U.S. 644, 49 S.Ct. 448, 449, 73 L.Ed. 889. Cf. Sec. 801, Note 2, supra, applicable alike to naturalized and native born.

[6] United States v. Herberger, D.C., 272 F. 278; United States v. Wursterbarth, D.C., 249 F. 908; United States v. Bergmann, D.C., 47 F.Supp. 765; United States v. Baumgartner, D.C., 47 F.Supp. 622; United States v. Ebell, D. C., 44 F.Supp. 43; United States v. Fischer, D.C., 48 F.Supp. 7. For instance, in United States v. Bergmann, supra, [47 F.Supp. 767], the district judge, quoting from a speech he had made as reported in the public press, declared:
"Fascism, Nazism, Communism postulate the omnipotence of the state and do not recognize the rights of the individual which may be asserted against it. They are the opposite of what you have been taught about the American government. The oath requires you to defend the Constitution and the laws of the United States against enemies for-. eign and domestic. This means that you must defend them against political philosophies opposed to them. If, after leaving this courtroom, you attempt to foster these alien philosophies in America, it will show that you do not mean this oath you take before God."

thrown unless the proof that it was obtained by fraud is clear and certain, indeed overwhelming. The result has been here that a solemn judgment has been set aside on findings based not on an understanding and appreciation of the meaning of the full stream of the citizen's life, as the record declares it, but on isolated statements, oral and written. Under this rule these isolated statements, made in part under stress of feeling, in part in banter, in part as mere dialectic, though trifles light as air, are made to seem confirmations strong as proofs from Holy Writ because they express historical, philosophical or political views of which those about him and those in authority are intolerant.

the jurisdictional prerequisites to the granting of citizenship.

The statutes clearly and fully lay down in support of the petition to cancel, not a word or line of evidence was offered as to any jurisdictional deficiency or defect in the proceedings leading up to the grant of the certificate. Not a line or word was offered as to things said and done in the five years' probationary period prior to its granting, from which it might be inferred that the citizenship was not sought and assumed in the utmost good faith and sincerity.[7] The Government's reliance, and that of the district judge, was entirely upon the relation back, as an interpreter of intention, of words, written and spoken, and acts done, beginning some five years after the granting of the certificate, every one of which words and acts taken singly and together were within the legitimate, indeed the constitutional and statutory, rights of citizens, naturalized and native born. Unless, therefore, Meyer, because a naturalized citizen of German descent had a more restricted right of free thought and speech, and of political, philosophical and historical discussion than other citizens had, there is no possible basis for the view that, in talking and acting as he did, he transcended his rights as an American citizen,

furnished any basis for a finding that his certificate had been procured by fraud, or subjected himself to any consequences except the loss of the good opinion of those who, differing strongly with him, had neither liking nor tolerance for his views or for him.

Appellant, pointing this out and insisting that some of the facts found as to what Meyer did and said have not been truly found and that the findings as a whole do not fairly reflect the record, urges upon us that if all are taken as well found, they do not furnish any basis for the ultimate finding that Meyer, with fraud in his heart and on his lips, took the oath of allegiance, and that the solemn judgment of the court, which admitted him as qualified, should be set aside. We agree with appellant. Taken at best for the government, there was a showing merely that some of the views attributed to Meyer with regard to the war and Germany's part in it showed that questions of right as between England and Germany and Germany and other European countries had been resolved by Meyer in Germany's favor, and that his sympathies as between England and Germany were with Germany. Taking his views, as shown by the record as a whole rather than by isolated expressions attributed to him by persons holding views violently opposed to the ones they attribute to him, there is not a thing that Meyer said that was not lawfully said thousands of times during the same period by citizens both naturalized and native born. Taking them most strongly against him, there is not a thing that would support the conclusion that his citizenship was obtained by fraud.

In support of his ultimate conclusion, the district judge set down that the record showed: (1) that Meyer spoke disparagingly of the American people as contrasted with the German people;[8] (2) that Meyer thought Germany would win the war; (3) that he thought that in any war there

---

[7] "The Decision whether he was lawfully entitled to the citizenship which he procured, and consequently whether he is now entitled to retain it, must turn on the existence of *his attachment to the principles of the Constitution when he applied for citizenship, and that must be inferred by the trier of fact from his conduct during the five year period.* * * * Our concern is only that the declared will of Congress shall prevail—that no man shall become a

citizen or *retain his citizenship whose behavior for five years before his application does not show attachment to the principles of the Constitution."* (Emphasis supplied.) Stone, C. J., dissenting in Schneiderman v. United States, 320 U.S. 171, 172, 63 S.Ct. 1358, 1359, 87 L.Ed. 1796.

[8] This finding, though not material, is completely refuted by the record as a whole.

was no moral question involved; that history showed that only success had ever counted where war was concerned; (4) that he was pleased over the victories of Germany over Poland, the Netherlands and France;[9] (5) that he was frequently disgusted with America and thought the American people stupid; that he believed American patriotism to be narrow nationalism, and on one occasion said that he could never be a real American;[10] (6) that he associated on friendly terms with Germans, some holding official places here under the German Government, who were later either interned or required to leave; (7) that he once said it would be a good thing to have a mild form of Fascism in America;[11] (8) that in September, 1939, he wrote an article which said in effect that America was to blame for this war because it had gotten mixed up in the last one, and thereby prevented Germany's winning it; (9) that he thought that Germany would win, and he thought a German victory would be a blessing to the world; (10) that he many times used the words, "our country", and "my country", meaning Germany, and "your country", meaning the United States;[12] (11) that he became an American citizen *only* because it was convenient and because he could say anything he wanted to, and that he would remain in this country *only* as long as it was to his material advantage;[13] and (12) then finally he found as an evidence of falsity, concealment and lack of good faith in 1935, the open, courageous and honest act of Meyer in 1940, in applying for a passport in order to effect his expatriation. Nothing came of this act, and Meyer abandoned his purpose, a purpose taken because of his feeling at that time, (a feeling which he admitted that he found out later, when his associates rallied to him, was a mistake) that he had no friends in America, that he was being discriminated against, and his views contested and despised because he was of German birth, and he thought he would not be happy here with persons of other descents, and especially persons with long American ancestry, treating him, because of his views, as though he were an outcast. But whatever his reasons for thus temporarily seeking expatriation, the prosecution and the district judge, in counting them as grounds to find fraud, have drawn an impossible conclusion that his exercise of a right given him by statute was an evidence of fraud five years before. More, by prosecuting, and finding against, him on account of it, they have gone directly in the face of the fundamentally declared right of expatriation fixed by statute[14] and existing in this country for nearly a hundred years. This act of his, when his mind and heart torn by the conflicts which on great tides of feeling, while we were still neutral, were dividing America into separate camps, in frankly and honestly advising with friends and the authorities with regard to his feeling that he ought to seek expatriation instead, as some were doing, sneaking and creeping about with service

---

[9] The record shows only that he did not blame Germany as others did for these victories, and sought to justify them as acts of war.

[10] The meaning conveyed by this finding, that he was anti-American, finds no support in the record. He wrote and spoke often of the fine qualities of Americans, and his pleasure in being a citizen, and his statement that he could never be a real American was made, half in jest, half in earnest, to persons who were boasting of their long American ancestry as opposed to his lack of it.

[11] One witness said that Meyer had said this, but his vast body of writings in the record and everything Meyer said and did showed him to be an individualist, a democrat, as that term has long been understood among us, a vigorous opponent of Fascism here and abroad. He was especially opposed to Communism, to National Socialism, to the idea of one party, and to the New Deal because he thought it akin to National Socialism.

[12] Moraud, an unnaturalized Frenchman, testified that on one occasion in a discussion with him, Meyer used the words, "our countries", as indicating Germany and France, a perfectly reasonable and natural thing to do.

[13] This finding is without support in the record.

[14] Among other things, this statute (note 2, supra) declares that the right of expatriation is a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty and the pursuit of happiness, and it concludes, "therefore any declaration, instruction, opinion, order, or decision of any officer of the United States which denies, restricts, impairs or questions the right of expatriation, is declared inconsistent with the fundamental principles of the Republic."

on his lips and a canker in his heart, was not, it could not be taken as, a badge of fraud.

Viewing the record as a whole and not picking it to pieces to find small hooks to hang adverse conclusions on as, since this is a suit to set aside a judgment, must be done, the picture emerges clearly, and it is not a picture of fraud but one, though sometimes of bad taste as well as bad judgment, of sincerity, of honesty, indeed, of honor. It is a picture of a highly educated specialist in German History, Literature and Language, holding views, some idealistic, some realistic, a sensitive, individualistic, and democratically inclined, but very human and very temperamental, person, contentious, combative, argumentative, excitable, with a strong sense of humor coupled with a meddlesomeness, indeed a kind of puckishness, but a person without pretense or guile. He was employed by Rice Institute while he was still teaching in Germany to come here as a part of the German Department, and hired to teach German because, being German, he was supposed to know German Language, German Literature, German History, German culture and the German people. He was so employed, and he was so admitted to this country and to citizenship, because it was thought that the culture of America was big enough and broad enough, and our people catholic enough to have and benefit from the best instruction obtainable in the cultures of the world. Emotional, excitable, neurotic, [15] temperamental, argumentative, [16] the defendant, born in Germany in 1904, and living there as a boy during the war and as a young man during the hard times following it, having family and friends there, was not expected when he took the oath as an American citizen or afterwards to stultify himself by pretending that he had no feeling for his native land, the law did not require him to, decency forbade it. What, and all that, he foreswore was allegiance and fidelity to the Government of Germany, not to German culture, German history, German tradition, or to his feelings as a whole for Germany, the country, as opposed to the government which had seized and dominated it. That he was opposed to that government, the record leaves in no doubt. At no time until this emotional and intellectual crisis came on him as a result of the conflicts of opinion between him and other American citizens and those of other nationalities who were not citizens, did he show the slightest evidence of any desire to expatriate himself or give up the citizenship which he had sincerely sought and sincerely obtained. It was only when, caught in the great tides of feeling which were running high here, his essentially honest, intelligent and candid mind commenced to worry whether the surging

---

[15] Mrs. Meyer testified: "He felt here that people were drawing away from him after the war started. He felt that his colleagues were drawing away from him and were discriminating against him. * * * *and I might say he was getting in a condition bordering on the stage of melancholia, and I was doing my best to bring him out of it but he came back from school every day, and there was an upheaval or something that had happened, some one had said something that hurt his feelings, he was discriminated against as a German born naturalized citizen, and he was becoming more and more distressed over it, and he was very much worried."

Mr. Meyer: "That was the feeling, everybody against me it seemed". "When I said anything, everybody said, 'Oh, just a Nazi, that—German'. Nobody would say, 'That—Republican'. If I said something which everyone else could say, it was attributed to my not being a real American, so gradually I just got in the habit of feeling unwanted, and whenever I came to the Faculty Club I sat down, and people would just sit at another table. * * * I didn't know that I had so many friends as I see now but at that time I was just under that constant pressure."

[16] Deevey, a student of Meyer, testified: "I should say he is inclined to be critical of a great many things. It seems to me it grows out of his technique of teaching, that is, the technique of conversation is of this sort. He likes to make statements, the more extreme the better, providing they strike fire from the opposition and drive the other person to take the opposite extreme position, and then, of course, in the conversation to work around to a common ground. Many of the statements made particularly in the first part of conversations as no doubt in his classes, although I cannot say, are of a very critical nature, of the kind that would sound bad in court or in print."

"Q. Would you say that he was very outspoken? A. I would, yes."

feelings in him which made him deny what some of the others said, that Germany was all wrong, the other European countries all right, were compatible with his continued citizenship here, that he turned in his bewilderment, and almost despair, to the utterly honest query, soon answered in the negative, whether he ought to expatriate himself and resume his German citizenship.

The record contains a mass of things written and said by Meyer in the most complete accord with the highest American traditions of liberty, of free thought and of free speech, and the development of democratic institutions. At times, goaded or goading, he did give expression more in the nature of arguments or of philosophical disquisitions than of deliberate expressions of feeling, to sentiments with which most of us were not in agreement then, and none of us, including the defendant are in agreement now that Germany has declared war on us and has shown that she is truly an Ishmaelite, her hand against every man's, and every man's hand against hers. We think it clear though that the sum and substance of what he said, and did, and wrote, the head and front of his offending, when considered in the light of the controlling principles of law, affords not the slightest basis for the conclusion that the solemn oath he took in the United States District Court for the Southern District of Texas, in 1935, was taken in fraud, that that tribunal or the United States was in any manner imposed upon, or that the judgment conferring citizenship on him must be set aside. Naturalized citizens are not wards of United States district attorneys, United States investigators, United States judges. Whatever may have formerly been thought, it is now settled law[17] that no naturalized American holds his citizenship by so slight a tenure as that he stands to lose it on a finding of fraud if he has given expression, since he obtained his certificate, to

---

[17] In their concurring opinions in the Schneiderman case, supra, Mr. Justice Douglas and Mr. Justice Rutledge eloquently state the matter thus:

Mr. Justice Douglas: "If findings of attachment which underlie certificates may be set aside years later on the evidence, then the citizenship of those whose political faiths become unpopular with the passage of time becomes vulnerable. It is one thing to agree that Congress could take that step if it chose. * * * But where it has not done so in plain words, we should be loath to imply that Congress sanctioned a procedure which in absence of fraud permitted a man's citizenship to be attacked years after the grant because of his political beliefs, social philosophy, or economic theories." 320 U.S. at page 165, 63 S. Ct. at page 1355, 87 L.Ed. 1796.

Mr. Justice Rutledge: "If this is the law and the right the naturalized citizen acquires, his admission creates nothing more than citizenship in attenuated, if not suspended, animation. * * * Until the Government moves to cancel his certificate and he knows the outcome, he cannot know whether he is in or out. And when that is done, nothing forbids repeating the harrowing process again and again. * * *

"No citizen with such a threat hanging over his head could be free. If he belonged to 'off-color' organizations or held too radical or, perhaps, too reactionary views, for some segment of the judicial palate, when his admission took place, he could not open his mouth without fear his words would be held against him. For whatever he might say or whatever any such organization might advocate could be hauled forth at any time to show 'continuity' of belief from the day of his admission, or 'concealment' at that time. Such a citizen would not be admitted to liberty. His best course would be silence or hypocrisy. This is no citizenship. Nor is it adjudication." 320 U.S. at page 166, 63 S.Ct. at page 1356, 87 L.Ed. 1796. While Judge Woodrough in his dissent in the Baumgartner case on appeal, 8 Cir., 138 F.2d 29, declares:

"The gist, as I see it, is that in actions in this form the 'allegiance' of the accused is an issue of fact, and that means, as I take it, the federal district judges have power to look into the utterances of foreign-born citizens arguing public questions to decide as 'facts' whether they are true believers in Americanism or tainted with heresy in that field. That is to say, that the judges have the same inquisitorial power over the minds of foreign-born citizens in matters political that the Spanish Inquisition had over the human mind in religion. I deny it.

"It matters not what foreign country may be interested in a public question being debated before our people. Our constitutional guarantee, maintains inviolate the right of every man to have his say about the public question notwithstanding." 138 F.2d 36.

political, philosophical or historical views which in the particular climate of opinion prevailing when he is tried appear to be not orthodox but heretical American doctrine. This must be so, for otherwise a naturalized citizen, instead of being, as the law intended him to be, a real American citizen, that is one who knows his rights and knowing dares maintain them, and is therefore open, honest and above board in speech and act, would be sneaking, deceptive and guileful, fearful lest honest opinion, honestly expressed, might, under the pressure of public opinion not in agreement with him, be seized upon to deprive him of his citizenship upon a charge of fraud. It ought to be, it is, in the absence of downright proof of fraud or illegality, enough that one district judge has judicially determined the right of a naturalized citizen to his citizenship. If that right, established by solemn judgment, is to be taken from him, it ought to be, it can be, taken only upon evidence clearly and positively establishing definite fraud. It cannot be taken upon suspicion or surmise of fraud or upon mere proof that since his naturalization the citizen has given expression to views or allied himself with organizations which in the then state of public opinion seem dangerous or inimical to the public welfare. If these expressions or acts of the naturalized citizen are criminal, he is subject like every other citizen to prosecution for them; if they are not, they subject him to no other legal consequences than a native born citizen doing or saying the same thing would be subject to. A painstaking and careful examination of the record, in the light of these views, shows that the proceeding to cancel defendant's citizenship is not well taken. The judgment of cancellation is therefore reversed and the cause is remanded with directions to vacate and set the judgment of cancellation aside and to dismiss the petition.

HOLMES, Circuit Judge (specially concurring).

I cannot concur in the opinion of the majority; it is too extreme; it goes further than is necessary to dispose of the case. Therefore, I must state my own reasons for concurring in the result.

In granting citizenship to aliens, the sovereign has no divine power to look into the hearts of applicants and say: "One of you will betray me." Therefore, every certificate of naturalization is issued upon the condition that it may be revoked if fraudulently or illegally obtained. The doctrine of res judicata does not apply to judgments granting naturalization.

It is said that in the United States the right of citizenship is a precious thing, dearer than the right to life itself. As to the patriot, whether native born or naturalized, this may be true; but to the alien, who is not attached to the principles of the Constitution and does not intend to reside permanently in this country, citizenship may be a mere matter of temporary convenience: but generalities aside, let us go immediately to the point in the case. The strongest evidence in the record against appellant tended to prove the following facts:

Appellant had opinions and expressed them freely, even in the class room, a fertile field for propaganda. He often stated to his classes that he was "in favor of Hitler and his actions." A student in Freshman German under Dr. Meyer testified that the latter defended German aggression in Europe and compared it with what the United States had done in their relations with the Indians. As to Germany's failure to observe the various treaties, he said that was just a part of the war; that the breaking of treaties was of small consequence.[1] His lectures were of such a character that an officer of Rice University requested him not to discuss politics in class.

---

1 "Direct Examination.

"Q. Do you recall what, if anything, was said about the various invasions that Germany had made? A. Yes, he justified Germany's grabs in these various countries in Europe by saying that it was nothing more or less than the United States had done in their relations with the Indians.

"Q. What, if anything, did he say regarding the observance of the various treaties? A. He said that was just a

part of the war; that breaking the treaties was of small consequence.

"Cross Examination.

"Q. The statements you have attributed to Dr. Meyer occurred during the school year 1940–1941, is that correct? A. Yes, sir.

"Q. Were those statements all made in open class? A. Yes.

"Q. Approximately how many students were there in that class? A. It varied from around 20 to 30, I guess."

In September, 1939, appellant wrote in substance that America was to blame for this war. He told his classes that Poland started the war, not Germany, and that Britain had no excuse for declaring war. In April, 1940, he said it would be a good thing to have a "mild form of fascism in America." In July, 1940, he wrote: "I think a German victory will be a blessing to Europe and to the world." He considered the American people stupid and their patriotism narrow. He asked Dr. Maraud: "How can a man like you live with those Americans?" As the war clouds gathered, he sought to return to Germany, which at his age would have meant his entry into the armed service of that country.

On September 30, 1940, he voluntarily applied for a passport. On that occasion, he said he could not remain in this country, because he was not in sympathy with the American attitude "toward the German Reich." He refused to sign the oath of allegiance printed on the passport, and feared he might become a fifth columnist. He said: "While my lips may not be a fifth columnist, I am uncertain about this" (putting his hand upon his heart). He said his friends and colleagues had fallen away from him, and blamed it on them rather than on himself. Many times he spoke of Germany as "my country", and the United States as "your country." He said he could never become a real American.

There was also evidence of other circumstances, such as appellant's association with German agents and propagandists in this country, his trips to Germany in 1936 and 1938, his request for an interview with Hitler and his alleged effort to see Goebbels while there, his conditional desire to win this case and then become an alien enemy anyway, his covert threat against several hundred Americans in German custody if anything happened to him, and his statement that he would remain in this country only so long as it was to his material advantage. These and the other facts above stated, which are mainly relied on to support the findings, occurred after the grant of citizenship to appellant.

Not being within the crucial five-year period, they have little relevance and are entitled to little weight under the decision in Schneiderman v. United States, decided June 21, 1943.[2] The decision in that case is controlling in this one.

[2] 320 U.S. 118, 63 S.Ct. 1333, 87 L. Ed. 1796. Schneiderman was born in Russia. He was granted citizenship in the United States on June 10, 1927. In December, 1939, the District Court held that his naturalization was illegally procured because, as a member of the Communist Party, he advised, taught, and advocated the overthrow of this Government by force and violence, and, therefore, was not attached to the principles of the Constitution. Its decision, 33 F. Supp. 510, which had been affirmed by the Circuit Court of Appeals, 9 Cir., 119 F.2d 500, was reversed by the Supreme Court. Referring to the five years preceding naturalization, the court said, 320 U.S. at page 147, 63 S.Ct. at page 1347, 87 L.Ed. 1796: "Since the immediate problem is the determination with certainty of petitioner's beliefs from 1922 to 1927 events and writings since that time have little relevance, and both parties have attempted to confine themselves within the limits of that critical period." At pages 151, 152 of 320 U.S., page 1349 of 63 S.Ct., 87 L.Ed. 1796, the court said: "The Government also sets forth excerpts from other documents which are entitled to little weight because they were published after the critical period."