## UNITED STATES v. TAPOLCSANYI.
### No. 4219.

Circuit Court of Appeals, Third Circuit.
April 17, 1930.

David Wallerstein, of Philadelphia, Pa., for appellant.

Henry Ellenbogen, of Pittsburgh, Pa., and Isaac E. Ferguson, of Chicago, Ill., Louis E. Graham, U. S. Atty., of Beaver, Pa., and Raymond D. Evans, Asst. U. S. Atty., of Pittsburgh, Pa., for the United States.

Before WOOLLEY and DAVIS, Circuit Judges, and JOHNSON, District Judge.

WOOLLEY, Circuit Judge.

The United States, by its bill, asked the District Court to vacate an order conferring citizenship upon John Tapolcsanyi and cancel his certificate on the ground that he procured his naturalization illegally and fraudulently by falsely alleging in his petition that he was attached to the principles of the Constitution of the United States. After a hearing in which it accorded the respondent a wide latitude in testifying about his principles, the court, finding the averment of fraud sustained by the evidence—mainly his own—vacated the order and cancelled his certificate of citizenship. This appeal followed.

The case turns on a question of fraud. As the Act of June 29, 1906, 34 Stat. 596, U. S. Code, title 8, § 382 (8 USCA § 382), prescribed as a condition of naturalization that "It shall be made to appear to the satisfaction of the court [that] * * * [the applicant] has behaved as a man of good moral character, attached to the principles of the Constitution of the United States," and as the respondent (then an applicant for naturalization) so made it appear by his verified petition in the precise words of the statute, the single fact question, determinative of fraud and therefore determinative of the validity of his naturalization, is whether he spoke truthfully or falsely.

In order to prove that Tapolcsanyi, contrary to his sworn statement, was at the time he applied for naturalization, opposed to the principles of the Constitution as generally understood and observed, the government introduced evidence in substance as follows:

In January, 1920, when under arrest on a warrant of deportation, he testified at a hearing before an Immigration Inspector as follows:

"The question was asked, 'Do you believe in the destruction of the bourgeois class?' He answered, 'Yes, I do, by the proletariat class.' He was also asked, 'Do you believe in the overthrow of the capitalistic class?' He answered, 'Yes.' He was asked, 'Do you believe in the Government of the United States as it exists today?' His answer was, 'No.' Also, he was asked, 'Are you op-posed to organized government?' He answered, 'Yes.' "

Four months later—May 27, 1920—Tapolcsanyi filed his petition for naturalization. On December 20, 1920, it was granted. Afterward there came into the hands of the government a letter, (introduced in evidence), bearing date October 17, 1921, which the respondent admitted he wrote and sent to his brother in Hungary. First giving his views of Hungarian capitalists, and charging his brother, who had been a soldier and later a gendarme, with murder of workmen of other nationalities and workmen of Hungary, he went on to say:

"You should know, if you do not know it yet, that the workingmen have only one country, and it is the Soviet Russia; and the Hungarian workmen will have a country of their own, only when Hungary will be Soviet also. * * * And know this—that I have been for the past eight years a pure, red Communist. * * * I want you to know that I respect a true fellowman, who has the same principles as I have a thousand times more than a brother who is patriotic. Such a man is an enemy to himself and also to me, and if it is true that you helped to murder by dear fellowmen, then I never, in this life, want to know you as a brother; and very calmly I could send a bullet through your heart, if these things are true. You should know that there is no difference between one workingman and another. * * * If you will regret all this and turn to the right path—in other words, if you will have your interests with the International Workingmen, the leader of which is the III Communist International, then you will be my brother and fellowman. * * * I know you will not like this letter, but it is my revolutionary duty to write all this to you. * * * one thing is certain—that I am a Communist and will be until my last breath. And now we will greet you once more and remain with revolutionary greetings,

"John, Theresa, and Bela."

Having there declared himself a Communist for a period beginning before the date of his petition for naturalization and continuing after his naturalization and having thus clearly attested his attachment to the principles of the International Workingmen whose leader is the III Communist International, the government, in order to show that, contrary to his declaration under oath, he was not at the time of his application attached to the principles of the Constitution of the United States, introduced evidence of

communistic principles in the form of a copy of a "Manifesto and Program, Constitution of the Communistic Party of America—report to the Communist International," the latter being the organization or a related organization of the type of the one to which he referred in his letter and in his testimony as vivifying his principles. Sensing the effect of this document, the respondent vigorously resisted its admission in evidence and now earnestly assigns its admission as reversible error on the grounds that it was not formally proved in that the government failed to prove its adoption by the Communist Party of America; and that, if genuine, it was a declaration not binding on the respondent who, though he held a membership card issued to him by that organization, says he is not a member of that party. In disposing of this assignment of error, together with a related assignment charging error in permitting a witness for the government to explain the political policies and relations of these communistic parties, it will be enough to say that if this were a suit in reliance upon, or growing out of, the constitution of one or another of these organizations, its constitution would of course have to be proved under familiar rules of evidence. But this is a proceeding in which a search was being made for the respondent's principles, which may be proved by showing the principles of the organizations of which he approved. Their principles may be found in their utterances made in as nearly a formal way as they are susceptible, namely; in published documents circulated to the public with the purpose of enlisting its adherence. Of these general principles we surmise the court could have taken judicial notice, but if we are wrong in that, or if there was technical error in admitting the evidence, any prejudice arising therefrom was cured by the respondent's reference to and adoption of their underlying principles, expressed by himself, as his code of life, which, without going into the organizations' scheme of things, were enough to show that his attachment to their principles was incompatible with an attachment to the principles of the Constitution of the United States.

Aside from this evidence the respondent himself declared that he had been "for the past eight years a pure, red Communist." The eight years prior to this declaration covered the very time he was seeking citizenship of the United States. While every tolerably informed person knows what a Communist is, we are not informed percisely what is a "red" Communist, yet the adjective "red" qualifying the word "Communist" seemingly suggests a superlative. From this description of himself, it is fair to conclude that the respondent was an extreme Communist, one without qualifications or reservations.

The respondent, however, threw more light on his state of mind by admitting that he did not believe in the representative government of the United States as it now exists when he testified to his belief in class government, that is, government by workmen, possibly including farmers, where the bourgeois, or middle class, and capitalists would not have the right to vote as they would no longer exist as such but, becoming laborers, they would have to work in the factories and mines which would be taken from them and thereafter would belong to workmen, all of which he testified he believed at the time of the hearing and believed in 1920 when he applied for citizenship. It is scarcely necessary to discuss the incompatibility of these ideas with the principles of the Constitution of the United States. But just here the respondent makes his capital point, which is that one of the cardinal principles of the Constitution is evolution, including the right of a citizen peaceably to work for a change of government, and that to this principle he was ardently attached, and in imposing his Communistic ideas upon this country he intended to work strictly in the manner the Constitution provides. While no one may be deeply attached to every provision of the Constitution and while all citizens have a right to work for its amendment in an orderly way; that is a right of a citizen. The respondent approached that right not as a citizen but as an alien. As an alien he had no such right. Moreover, citizenship itself is not a right; it is a privilege—a civil status conferring rights and immunities. The respondent alien of course was free to apply for the privilege which the sovereign government might refuse altogether or might grant on such conditions as it should impose. In this instance it imposed upon the respondent the indispensable condition that he be attached to the principles of the Constitution. As it was clear to the learned trial judge, who saw and heard the witnesses, and is equally clear to us that he was not attached to its principles at the time he applied for naturalization, the respondent did not meet that condition. Therefore as his statement in his petition to the contrary, however honestly made in view of his peculiar notions, amounted in law to a false representation, the order admitting him

to citizenship must stand vacated and his certificate of citizenship remain cancelled.

Affirmed.