## UNITED STATES v. BERGMANN.
### No. 2304.

District Court, S. D. California,
Central Division.
Nov. 23, 1942.

Leo V. Silverstein, U. S. Atty., and James L. Crawford and John Marvin Dean, Asst. U. S. Attys., all of Los Angeles, Cal., for plaintiff.

Walhfred Jacobson and Fred N. Howser, both of Long Beach, Cal., for defendant.

YANKWICH, District Judge.

The Government seeks to cancel the certificate of naturalization issued to the de-

fendant, Friedrich Walter Bergmann, a former citizen of Germany, on April 9, 1937.

As grounds for the cancellation, the Government has alleged, in its complaint, that the certificate was obtained by fraud. More particularly, it has alleged that, contrary to his representations and to his oath of allegiance, the defendant was, "not in fact attached to the principles of the Constitution of the United States at the time of the filing thereof nor during the five years prior thereto; in that he did not in good faith intend to renounce absolutely and forever all allegiance and fidelity to The German Reich, of which he was then a subject, but in fact intended to retain allegiance and fidelity to the said German Reich."

And that "he did not in fact renounce and abjure all allegiance and fidelity to the said, The German Reich; in that he did not in fact intend to support the Constitution and laws of the United States of America against all enemies foreign and domestic; and in that he did not in fact intend to bear true faith and allegiance to the same, but in fact did intend to remain a subject of The German Reich and to maintain his allegiance thereto".

The defendant has denied these allegations and has protested his loyalty to the Government of the United States.

Has the charge been proved?

Naturalization is a privilege. It is granted only upon strict compliance with the conditions laid down by the Congress. 8 U.S.C.A. § 701 et seq. As said by the Supreme Court in Luria v. United States, 1913, 231 U.S. 9, 23, 34 S.Ct. 10, 13, 58 L. Ed. 101: "These requirements plainly contemplated that the applicant, if admitted, should be a citizen in fact as well as in name,—that he should assume and bear the obligations and duties of that status as well as enjoy its rights and privileges. In other words, it was contemplated that his admission should be mutually beneficial to the government and himself, the proof in respect of his established residence, moral character, and attachment to the principles of the Constitution being exacted because of what they promised for the future, rather than for what they told of the past." See United States v. Beda, 2 Cir., 1941, 118 F.2d 458, 459; Samras v. United States, 9 Cir.,1942, 125 F.2d 879, 881.

Thus, in many respects, more is demanded of an alien than of a native-born citizen. A native-born citizen need not be literate to exercise his civil rights, unless the state law so requires. But an alien must know the English language. 8 U.S.C. A. § 704. No matter how well educated he might be in other languages, ignorance of English is a bar to citizenship.

A native-born citizen may be a conscientious objector. An alien, even a woman, who refuses to bear arms, cannot be naturalized. United States v. Schwimmer, 1929, 279 U.S. 644, 49 S.Ct. 448, 73 L.Ed. 889; United States v. Macintosh, 1931, 283 U.S. 605, 51 S.Ct. 570, 75 L.Ed. 1302; United States v. Bland, 1931, 283 U.S. 636, 51 S.Ct. 569, 75 L.Ed. 1319; In re Warkentin, 7 Cir., 1937, 93 F.2d 42.

A native-born citizen may be immoral. And, unless he is convicted of a felony, he cannot be denied his civil rights. But an alien must be of good moral character before he can be admitted to citizenship. 8 U.S.C.A. § 707.

More, a native-born citizen may be opposed to the principles of our constitutional government. And, unless he actually advocates its overthrow, by force, he may go unmolested. But an alien must be "attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States". 8 U.S.C.A. § 707. (And see United States v. Tapolcsanyi, 3 Cir., 1930, 40 F.2d 255, 257; Kjar v. Doak, 7 Cir., 1932, 61 F.2d 566, 569.)

When, through concealment, a certificate of naturalization is obtained in violation of any of these requirements, there is fraud, for which the certificate may be cancelled. 8 U.S.C.A. § 738; United States v. Ginsberg, 1817, 243 U.S. 472, 37 S.Ct. 422, 61 L.Ed. 853; Maney v. United States, 1928, 278 U.S. 17, 49 S.Ct. 15, 73 L.Ed. 156; United States v. Kramer, 5 Cir.,1919, 262 F. 395; Schurmann v. United States, 9 Cir.,1920, 264 F. 917, 18 A.L.R. 1182; Glaser v. United States, 7 Cir.,1923, 289 F. 255; United States v. Woerndle, 9 Cir.,1923, 288 F. 47; Rowan v. United States, 9 Cir.,1927, 18 F.2d 246; Turlej v. United States, 8 Cir.,1929, 31 F.2d 696.

The spirit of these requirements and of the oath of renunciation and allegiance prescribed by the Congress, 8 U.S.C.A. § 735, I have sought to express in addresses de-

livered at various times to persons about to be naturalized. I repeat a portion of one of them, as reproduced in the press.

"The oath you are about to take requires the renunciation of allegiance to the country of your birth, and the assumption of a new loyalty to the United States.

"Americanism does not brook a divided allegiance. You are not required, however, to surrender any religious ideal, nor to give up any of your cultural heritage. American civilization is a composite pattern to which many different racial and national groups have contributed.

"However, loyalty to the United States implies the surrender of whatever there may be in the culture of your country which is contrary to the fundamental ideals of America." * * * *

"The chief characteristic of American constitutional government is its insistence on the rights of the individual, rights of which he cannot be deprived by the state. This heritage is embodied in our Bill of Rights.

"Fascism, Nazism, Communism postulate the omnipotence of the state and do not recognize the rights of the individual which may be asserted against it. They are the opposite of what you have been taught about the American government. The oath requires you to defend the Constitution and the laws of the United States against enemies foreign and domestic. This means that you must defend them against political philosophies opposed to them. If, after leaving this courtroom, you attempt to foster these alien philosophies in America, it will show that you do not mean this oath you take before God." (From Los Angeles Times Sunday Magazine, January 21, 1940, page 11.)

The facts here must be considered in the light of these principles.

■ Citizenship once granted should not be revoked except upon positive proof of fraud. Allowance must be made for statements made in the heat of passion. At times, people are "goaded" into making extravagant statements. We must also take into consideration the fact that in and out of the Congress, prior to America's entry into the war, most fantastic opinions regarding the European war and the part the United States should play in the world crisis were uttered with impunity.

In fact, the most extreme forms of denunciation of everyone from the President down who took a friendly attitude towards Britain occurred in the Congress and the Press. The motives of the German Reich were extolled. Those of Britain and of the United States were denounced. (For some of these utterances, See Time Magazine, Vol. XL, No. 20, November 16, 1942, p. 20, Col. 1). An otherwise gentle woman poet, advised the United States to accept totalitarianism and ride along on the "wave of the future." (See Anne Morrow Lindbergh: The Wave of The Future, 1940.)

Such dissidence is of the essence of our freedom. We not only allow it. We protect it by constitutional guarantee. (See my recent article, Freedom of the Press in Prospect and Retrospect, 1942, 15 So. Calif. Law Review, 322, 332.)

But here we have more than the advocacy of a policy which later events proved unrealistic and detrimental to the United States. In season and out of season, without provocation, the defendant, both before and after America's entry into the war, has upheld the cause and governmental philosophy of present-day Germany and has berated those of the United States. They embody antipodal systems of thought. One cannot profess or serve both, without disloyalty to one. "No man can serve two masters: for either he will hate the one, and love the other; or else he will hold to the one, and despise the other." Matthew 6:24.

To my mind, the facts testified to by the many witnesses who appeared in this case gave expression to the feeling which the defendant himself entertained when, in his statement of facts filed in connection with his application for citizenship, dated November 5, 1936, in answer to the question: "26. If necessary, are you willing to take up arms in defense of this country?" he first wrote "Yes". After discussing the answer with the Examiner, he caused this reservation to be added: "But will not take up arms in an attack upon Germany". When informed by the Examiner that refusal to bear arms against a particular country may result in a denial of citizenship, he caused the reservation to be deleted. He stated at the trial that the Examiner left him for about fifteen minutes and that he notified him of his change of attitude when he returned. ("I then and there changed my mind",—to use his own words.)

The fact was not called to my attention when, on April 9, 1937, I acted on the Ex-

aminer's recommendation that the defendant be admitted to citizenship.[1]

To refer to one's self as a Nazi when being introduced to a stranger, to give Hitler's salute, "Heil Hitler", on taking leave from non-German speaking persons, to praise Hitler, to identify one's self with him by saying "We,—Hitler" will do thus and so, ("use gas"), to approve and advocate world dominion by Germany and Japan, to express a desire to return to Germany to fight on her side, and to live

---

[1] As revealing are some of his statements made to an agent of the Federal Bureau of Investigation on May 5, 1942. We reproduce the following:

(1) "I want very much to see this present war over quick. I am disgusted with the white men for getting into this war. The white people should realize that east is· east, west is west, north is north and south is south. They should not go beyond their rights. The whites should attend to their own business. * * *"

(2) "There must always be a Germany. A country of 80 million people has a right to have land enough to sustain them. The colonies she once possessed were nothing but barren and desert land with the possible exception of German East Africa. * * *"

(3) "I didn't join in as much as I don't believe in German Clubs and the like ~~It~~ because I'm an American citizen. ~~is not that I'm not proud of being a German.~~ However, having been ~~man.~~ I am proud of ~~being~~ a German. It is a great country. Germany is one of has had world wide admiration for science and commerce. ~~the nations that are not asleep. German~~ ~~people are wonderful. During the last~~ ~~war every one fought for our Fatherland.~~ I came to this country to better myself."

In these passages there crops out the familiar German and Japanese justification of their ruthless aggression. In the first (1), we have the Japanese cry of "Asia for Asiatics" and the apology for Japanese war aims as by tracing them to the white man's aggression.

"I am disgusted with the white man for getting into this war", might well have been written by a Japanese apologist for "the new order in East Asia". (See, Wilfrid Fleisher, Volcanic Isle, 1941, especially Chapter 11, pp. 320 et seq.)

No amount of rationalization can change this statement, made six months after the United States was forced into war by Japan's treacherous attack, into the mere expression of an idealist's disappointment in the failure of the Caucasian nations to take proper measures, at the end of the last war, to avoid its repitition, as the defendant sought to do at the trial.

In the second excerpt (2), we have the all-too-familiar statement of Germany's plea for territorial expansion, the Lebensraum theory, which advocates and defends conquest, on the plea of pressure of population on a "have-not" nation.

Hitler expressed these thoughts in an address to German workers.on the meaning of this war;

"It is a struggle of two worlds.

"Forty-six million English rule and govern a total territory of roughly 40,000,-000 square kilometers in this world.

"Forty-five million Italians have an area of utilizable land of hardly half a million square kilometers.

"Eighty-five million Germans have a living space of hardly 600,000 square kilometers, and this only through. their own initiative.

"Man living not on phrases, not on declarations, not even on Weltanschauungen, he lives on what the earth yields him through his labor in the form of foodstuffs and raw materials.

"Just as internally developing tensions between rich and poor must be balanced, thus in the life of the peoples one cannot claim everything and leave nothing to others.

"They say: 'We English, we Americans, we French, are the "haves", and whoever "has not" must be satisfied with not having.' To some, I was the representative of the 'have nots'." (Quoted in Gustave Stolper: This Age of Fable, 1942, p. 171.)

The last passage in the defendant's statement (3) is given, both in the form in which it was reproduced by the agent, after conference with the defendant, and as it read after the defendant edited it. Standing alone, it might perhaps be considered mere boastful pride of ancestry. But taken with the other statements, with the plea for help to Germany after the war ("All American citizens have a duty after the war to help Germany"), they exhibit exultation in a misunderstood and unconquerable Germany, which does not spell loyalty to the United States. "There must always be a Germany", is more than mere braggadocio. The defendant's verbal protestations of loyalty to the ideals of the United States sound hollow when compared with such warm-hearted defense of Germany and all its deeds.

there "like a white man", to condone the Japanese attack on Pearl Harbor ("They had to do it"),—even if we disregard entirely the defendant's profane references to the President of the United States,—evince a disloyalty, which must have been clearly present at the time of naturalization. They constitute fraud most foul. They cannot be waved aside by attributing them to boastfulness,—as counsel for the defendant have endeavored to do in their cross-examination of the Government's witnesses,—or by claiming, as the defendant sought to do at the trial, that he was either jesting or that his meaning was not understood. It should be borne in mind that we are not dealing with an ignorant person who, laboring under limitations of language, may utter, in the heat of argument, words which do not express his thoughts clearly. Persons under such disadvantage may, at times, cause expletives to take the place of thought. It is almost proverbial that foreigners quite often learn to curse in English long before they learn to speak it. Unfortunately, at times, that is about all they learn.

But the defendant is not in this class. He is a man of good educational background, whose English, whether spoken or written, is correct; who, while giving an alien intonation, at times, to his words, does not seem to be lacking, at any time, in felicity in using the English language. In fact, even in his volubility, to which witnesses referred repeatedly, and which was quite evident during his examination in court,—he never was at a loss to find the right and grammatically correct manner of expressing his thought. Nor are we dealing here with isolated outbursts. More than a dozen persons from all walks of life, from humble neighbors to bank executives, have testified to the defendant's constant protestations of allegiance to Germany and to its cause, to the repeatedly unsought, unprovoked, and, often, uncalled-for advocacy of Germany's ideology and the justification of the war-like means used to impose it on the world.

■ Most of these incidents were not denied. The defendant merely sought to explain them away.[2] They lead to the conclusion that when the defendant was admitted to citizenship on April 9, 1937, he was not "attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States." 8 U.S.C.A. § 707. And that he swore falsely when he took the oath of renunciation and allegiance. For he bore no fealty to the United States and did not intend to renounce allegiance and fidelity to the German Reich.

"Loyalty or allegiance is, necessarily, of slow growth; therefore, somewhat involuntary, not fully subject to the will. Those who lightly, for temporary advantages, undertake to change their allegiance, are liable to overlook the deep-seated nature of this feeling; but the fact that not until afterwards, in times of stress, is it made manifest that the desires, suffered to lie dormant, are stronger for their native than their adopted country, although this fact may not be fully realized at the time of their naturalization, renders it none the less a legal fraud for the applicant to fail to disclose his true, although latent feeling in such a matter." Judge Edward E. Cushman, in United States v. Herberger, D. C. Wash.1921, 272 F. 278, 291.

And see United States v. Tapolcsanyi, 3 Cir.,1930, 40 F.2d 255, 257; United States v. Shapiro, D.C.Cal.1942, 43 F.Supp. 927, 929, 930.

The certificate of naturalization is ordered cancelled. Formal findings and judgment to follow.

---

[2] Their force is not overcome by the testimony of witnesses produced by the defendant, that, in their presence, he uttered loyal sentiments or that he was thrifty ("miserly", as one of his witnesses characterized him in a deposition), hard working, eager to accumulate money, proud of his financial success, and satisfied with the community (Long Beach, California), in which he had achieved it. A good portion of this testimony was purely negative. Much stress was laid on the fact that, at various times, the defendant had stated that he would leave some of his possessions, such as an archeological collection of South Sea materials, to some public body, and others to the Salvation Army and the Y.M.C.A., which had befriended him when in need. Unexecuted or promised philanthropy ("charitable intention", as the defendant called it) is not necessarily a badge of loyalty.