566

## UNITED STATES v. HEYMIG.[*]
### No. 360.

District Court, N. D. Indiana,
Hammond Division.

June 15, 1943.

Alexander M. Campbell, U. S. Atty., of Fort Wayne, Ind., and Luther M. Swygert, Asst. U. S. Atty., and James E. Keating, Asst. U. S. Atty., both of South Bend, Ind., for plaintiff.

Crumpacker & Friedrich and Stanley Tweedle, all of Hammond, Ind., for defendant.

SLICK, District Judge.

United States of America by its District Attorney for the Northern District of Indiana brings this suit against the defendant and prays that defendant's naturalization which was granted on the 10th day of May, 1932, be cancelled. The petition alleges that after filing declaration of intention to become a citizen, the defendant did on May 10, 1932, in open court, take the following oath of allegiance: "I hereby declare on oath that I absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state or sovereignty and particular-

ly to the German Reich of whom or which I have heretofore been a subject or a citizen; that I will support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; and that I take this obligation freely without any mental reservation or purpose of evasion," and that he committed a fraud upon the court at that time in that he had a mental reservation of allegiance to the German Reich.

At the outset I consider it quite important to determine the degree of proof required in a suit of this nature. Counsel for the government have argued very ably that only a preponderance of evidence is required. Counsel for defendant have argued strenuously that the evidence must be sufficient to convince beyond a reasonable doubt.

In United States v. Schuchhardt, D.C., 49 F.Supp. 567, 568, opinion by Judge Duffy, the court used the following language: "The burden of proof is on the government. to establish the affirmative of its contentions by more than a mere preponderance of the evidence. Fraud is alleged and the government must establish such fraud by clear and satisfactory proof."

In United States v. Bergmann, D.C., 47 F.Supp. 765, 767, the court said: "Citizenship once granted should not be revoked except upon positive proof of fraud."

In United States v. Marini, D.C., 16 F. Supp. 963, 964, the court said, "Order of naturalization should not be canceled unless fraud or illegality complained of as leading to granting of order and certificate of citizenship is proved by very clear and thoroughly satisfactory evidence."

In United States v. Sharrock, D.C., 276 F. 30, 32, the court said, "Nothing will warrant cancellation of his grant of citizenship, but clear, unequivocal, and convincing evidence, that in quantity and quality inspires confidence and produces conviction of the truth of the charge, virtually beyond reasonable doubt."

And in United States v. Eliasen, D.C., 11 F.2d 785, 786, the court said, "Like any grant, that of citizenship is not to be avoided save by evidence which in quality and quantity commands credibility and inspires conviction of the truth of the charge— virtually beyond reasonable doubt."

[*] The Supreme Court of the United States in Schneiderman v. U. S., 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. —, since the filing of this opinion, has held in conformity with this opinion.

From these excerpts from decisions by other Federal Courts it seems clear to me that the rule not only should be, but is, that the evidence of fraud must be clear and convincing to a degree that it satisfies the mind of the court of the truth of the charges, beyond a reasonable doubt.

I have carefully read the briefs of counsel and the record of the evidence in this case. The evidence is replete with extravagant statements made by the defendant concerning the military strength of Hitler's Germany, but nowhere does it appear that the defendant expressed the hope that Germany would win over the United States. These querulous expressions sound like the utterances of a stubborn, contentious person rather than a disloyal one. Defendant seemed willing and even anxious to enter into discussions with any and all persons on subjects of war, politics, military tactics and the future of Germany, but he never did anything against his government; never did a subversive act; never joined the Bund or any other subversive society, although he did attend one meeting of the Bund and immediately thereafter said the talk about the Bund was the "bunk" and the statements concerning its strength were the "bull."

On the other hand, although in very poor circumstances, defendant bought a bond and cooperated in the scrap iron drive, contributing about two tons of scrap iron. He belonged to the Red Cross and long before the present war he had a small American flag in his store and under it the legend, "God Bless America." All these things argue in favor of his loyalty rather than the contrary. He never taught his children anything but loyalty to America. The government admits in its brief that the four children are good citizens, and argues that if the court will sustain its contention and cancel defendant's citizenship, the Department of Justice will agree that his four children may immediately apply for and have granted citizenship. This argument is not persuasive. This court has no right to barter away defendant's rights on any such flimsy pretext. If defendant is guilty as charged, his citizenship should be forfeited regardless of the result it may have on the rights of members of his family. If he is not guilty, the court should have the courage to say so, even in the face of neighborhood gossip and the hysteria generated by these very trying war conditions. This is no time for maud-

lin sympathy for disloyal Germans, neither is it the time to shrink from responsibility. We must not let our prejudices run riot. We must not look for witches to burn. It is important at this time of our great emergency that we maintain an attitude of judicial equilibrium. We must not yield to mob psychology.

Defendant made many statements that were aggravating, to say the least. One witness testified that he had many arguments with defendant before Pearl Harbor. Defendant expressed the opinion that the German army was very strong, that Japan would attack us without warning like she did Russia. These were friendly arguments. Then the day following the attack on Pearl Harbor defendant came to the witness' home and was greatly excited and said, "I told you so." As the witness expressed it, "He was laughing, very excited, like a kid. He had proved his point all right." This evidence can be regarded from two viewpoints. If you consider that he was laughing because he was greatly pleased, that sounds very bad. But the witness says he was greatly "excited", not elated. He had prophesied just such an attack. His prophecy had come true. He had won his argument. It is just as reasonable to construe his laughing as an expression of deep emotion as to regard it as evincing pleasure. He did not say anything indicating that he was glad. He only said, "I told you so."

Another bit of evidence relied on by the government is his conduct and language in reference to the American flag. It appears from the testimony of one Lynch that on July 5th, he, Lynch, parked his car with several American flags on it near the front of defendant's place of business, a small grocery store. Defendant claimed this interfered with delivery trucks and, according to witness Lynch, remonstrated to Lynch. Whereupon Lynch "told him he should be proud of having a car parked there with American flags by his place of business," to which defendant replied, "To hell with the American flag, and you too." After this incident Lynch and defendant had a fist fight and defendant had Lynch arrested. There was bad blood and hard feelings between Lynch and defendant and this language should be judged by the surrounding circumstances. The time was July 5, 1941, five months before our entry into the war. There is no doubt in my mind but that Lynch goaded and provoked

the defendant. He parked his car across the street from his own place of business and in front, or nearly so, of defendant's business, and when defendant remonstrated, he, Lynch, did not attempt to justify the manner of parking his car, but angered defendant with the admonition that he, defendant, should be proud to have the flag in front of his store. This conduct was well calculated to arouse the ire of any well intentioned person. Of course, defendant should not have used the language about the flag, and if he did, which he emphatically denies, he is entitled to censure. But words spoken in anger or under severe mental strain of provocation should not be given the same significance as if spoken deliberately. I am not at all persuaded that, if defendant did use the language attributed to him on this occasion, he meant any disrespect to the flag. I think his whole thought was to protest the parking of the car in front of his grocery store and its attempted justification. I can readily understand one's feeling of resentment against what he considers an imposition attempted to be justified by an appeal to patriotism. It evidently aroused defendant to a fit of anger and to the use of explosive epithets he would not have used in moments of calm deliberation.

Much is made of the testimony of two witnesses to the effect that they saw a picture of Hitler in the home of defendant in 1934. These witnesses, grown women now, were about twelve years of age at the time they thought they saw a studio photograph of Hitler in the living room of defendant's home, and did not know at the time or realize who Hitler was. He was just starting on his rise to power. He was not the powerful dictator he has since become. There is a wide difference between Corporal Schickelgruber of 1934 and Dictator Hitler of 1944, and when we attempt to relate this evidence to 1932 and argue that it shows a state of mind favorable to Hitler as against the United States in 1932 when Hitler was an unknown troublemaker and revolutionist, the argument falls of its own weight.

Furthermore, I am not at all satisfied that these two witnesses ever saw a picture of Hitler in defendant's home. They were not very convincing in their testimony— did not seem sure of themselves. Their knowledge about Hitler's picture was based on what one of defendant's little girls said. She is supposed to have said that the photograph was of "our ruler over in Germany." She was a child of twelve or thirteen years and had been in this country six or seven years, so she was six or seven years old when she left Germany, and was talking about Germany's ruler at a time previous to Hitler's ascension to power. In fact he, Hitler, was not even then the ruler of Germany. The presence of a photograph is explained by members of defendant's family, admitted by government counsel in their brief, to be good, loyal citizens, as that of defendant himself taken when he was quite young and had a little black mustache. The only other picture shown to have been in defendant's home is that of the President of the United States.

This evidence is entirely too flimsy to be considered seriously. We must remember that it is the state of mind of defendant in 1932 that we are considering. He is charged with committing a fraud upon the court in 1932 when he swore allegiance to the United States in that he did not intend in good faith to renounce his allegiance to the German Reich, but did intend to reserve allegiance thereto. If this charge is true, the fraud existed and vitiates the proceedings which ripened into full citizenship. But what reliable evidence is there in the record to prove these charges? Acts and statements which for the most part were done or made before our entry into the present war.

Defendant said that "When Hitler wins the war we will be ruled by Hitler." This is far from expressing the hope that Hitler wins, it is but the expression of an opinion we have heard on every hand by loyal Americans. We might add that if Japan wins we will be ruled by Hirohito, without being charged with siding with Japan.

This is not sufficient. Many of our most loyal citizens were outspoken in their opposition to our doing anything that would lead us into the war. Many of our most distinguished members of Congress in both Houses were unrestrained in their opposition. But after Pearl Harbor no loyal American thought or said or knowingly did anything to impede our progress in our war efforts or to encourage or give aid to our enemies. Language which would rightly be considered the exercise of our constitutional right to free speech if uttered before Pearl Harbor or before the declaration of war against Germany and Italy might very reasonably be considered

as highly culpable and disloyal and even treasonable if uttered since. So we must consider defendant's talk and prophecies as to the probability of Hitler or Japan winning in the light of the circumstances under which they were made and the time they were uttered.

Practically all the acts and statements of which the government complains were committed or uttered before Pearl Harbor, and it may be true that defendant really hoped and still hopes for a German victory but this is highly conjectural. Many of the things complained of are as consistent with innocence as with guilt. He thought Rommel, the desert fox, was a great general. So did General Montgomery and General Eisenhower. So did we all.

Defendant is past sixty years of age. He was born near Rheinhousen, Germany. He claims to be of French rather than German descent. His grandfather on his father's side was a Frenchman and his grandmother on his father's side was a French-speaking Belgian. He worked as a bricklayer in Germany and was not in the army during the First World War. He came to this country in 1926 and in about nine months after landing here filed his declaration of intention to become a citizen, taking the oath of allegiance in 1932.

Conditions of the laboring classes in Germany at the time he left were very poor. He prospered here and in about a year and a half sent for his family, consisting of a wife and four children. Defendant and three of his children testified at the hearing and all told in glowing terms of the great improvement in this country over conditions as they knew them in Germany. The children all attended public schools here and all are married. During the depression defendant obtained a cart and with his son peddled produce from house to house and on the streets rather than go on charity. He has never been anti-semitic, in fact many of his friends and business associates are Jews. There is no evidence in the record even tending to show any subversive activity. If there is reason to believe that he is a dangerous character or is a menace to our military establishment, then as was said by Judge Coleman in United States v. Polzin and in United States v. Jentzsch, D.C., 48 F.Supp. pages 476 and 482, our army has ample power and authority to deal with him either by establishing a strict surveillance or

by requiring him to live outside certain military areas.

This court cannot, and would not if it could, in any manner whatsoever, attempt to abridge the authority of the army in the exercise of this power, if it should be decided that it is necessary to act, in the circumstances, in the interest of safety to our armed forces.

The granting of citizenship in the first instance and cancelling citizenship for fraud are as wide apart as the poles. I am free to admit that if defendant were an applicant for citizenship, the evidence adduced in this case would cause me to hesitate and most likely refuse it or, at least, delay the granting of it until after the end of the war. In such a proceeding any reasonable doubt should be resolved against the applicant. The reverse is true in a proceeding to cancel citizenship once granted. Here defendant is entitled to the benefit of a reasonable doubt.

This is recognized by the layman as well as the legal profession and a witness in this case unconsciously gave expression to this rule.

Witness Frank Johnson testified that he had had many friendly arguments with the defendant concerning the relative strength of the Allied and Axis Armies. After testifying at length, he was finally asked the following questions, without objection, and made the following answers:

"Q. Do you think he (defendant) is anti-American? I want your honest answer. A. Well, frankly, if I was the judge giving him his papers, I would not give them to him.

"Q. All right, would you take them away from him after he has lived here all his life? A. That is hardly a fair question. I would not do that to a dog, if I could get away from it.

"Q. (by the court) Sort of invading the province of the jury, aren't you? A. I think that is the most wonderful thing a man could have. Far be it from me to try to take it away from him."

And that is the crux of the whole matter put by a witness in homey, but forceful, style.

I agree with witness Johnson. I probably would not grant citizenship to defendant, but I am not satisfied to that degree required by the law to take away from

him a right that he should, and I hope docs, value very highly.

In other words, the whole evidence fails to convince, beyond a reasonable doubt, that defendant, when he took the oath of allegiance, did not act in the utmost good faith.

For these reasons judgment should be for the defendant.