## UNITED STATES v. GIESE.

### No. 641.

District Court, W. D. Washington, N. D.
Sept. 16, 1944.

J. Charles Dennis, U. S. Atty., and G. D. Hile, Asst. U. S. Atty., both of Seattle, Wash., for plaintiff.

Chadwick, Chadwick & Mills, of Seattle, Wash., for defendant.

BLACK, District Judge.

In this case the government seeks a decree cancelling the naturalization certificate of Hans Otto Giese on the alleged ground that in 1930 at the time of his admission to citizenship his oath of allegiance to the United States was fraudulent in that at such time he secretly retained allegiance to the German Reich.

The final issue to be decided in this case is the state of mind which the defendant actually had on that critical date in 1930. If on that date his intentions were in accord with the oath which he took his naturalization must stand, regardless of whether or not at some later date he again became loyal to the German Reich.

An overwhelming amount of evidence was submitted by both parties. Hundreds of exhibits were offered, a considerable portion of which were admitted. Numerous and voluminous depositions of absent witnesses with bulky exhibits were pre-

sented to the court in addition to the oral testimony of many witnesses. Hardly any of the testimony directly applied to any portion of the year 1930 and very little of it related to the period before 1930. But there was a great mass of oral and written testimony covering the time from 1932 or 1933 until the date of the trial itself.

That presented by the government was that the defendant in 1932 or 1933 until after Pearl Harbor was very active in word and deed as an advocate of Hitler and Naziism. That submitted by defendant was that the defendant was a most loyal American and highly patriotic. From such conflicting evidence of subsequent conduct of defendant and some little evidence of happenings before 1930 it was expected that the court should determine what was defendant's actual heart and mind in 1930 when he took the oath.

When this case was instituted by the government the law of denaturalization, consisting chiefly of decisions by the trial and circuit appellate courts, seemed to be quite clear. In fact, at such time the government, undoubtedly on the basis of such decisions, was very confident that with the evidence it possessed the only possible outcome could be the denaturalization of defendant. However, shortly before the trial commenced the Supreme Court of the United States in Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796, in lengthy dissertations in the majority, concurring and dissenting opinions totaling about ninety printed pages, made the question here involved very close and difficult.

Defendant, who finished his general and received his legal education in Seattle, was born in Germany. He is of a colorful personality, energetic, ambitious, of wide acquaintance, talented athletically, and with an attractive family consisting of his Victoria-born wife of Norwegian ancestry, and two Seattle-born children.

Defendant's father, who died before the First World War, was mayor of Altona, Germany, up to the time of his death and as such was a member of the Prussian House of Lords. Defendant's mother, two brothers, and other relatives, were still living in Germany when the case was tried. In 1923 the defendant decided to leave Germany to better himself financially. He decided the United States offered excellent economic opportunities and the fact that this country did not ratify the Treaty of Versailles, he says, was very persuasive to him. In 1923 a few months after his arrival he made his declaration of intention to become a citizen. In February, 1929, while he was an employee of the German Consul's office in Seattle he wrote to the Foreign Office in Berlin with reference to the future possibility of his becoming an official of the German Foreign Service. In such letter he said: "I would be very grateful to you, if an opening could be created for my entering upon the higher-official career in the Foreign Office. I am taking the liberty to add that I am of a strong constitution, and positively assume that I can stand the tropics. It is my intention to continue my studies for several semesters in Germany, should my request be answered in an affirmative manner on principle."

At the time of writing such letter he was attending the University as his duties as Assistant Secretary at the German Consulate permitted. The response of the German Foreign Office to his letter of 1929 was that his education was not sufficient to permit his consideration as a higher official in the German Foreign Service.

In August, 1930, based upon his 1923 declaration of intention, he submitted his petition under oath for American citizenship. In November, 1930, in a hearing before Judge Neterer he was admitted to citizenship and took the oath. He concedes that in 1930 neither Judge Neterer nor any member of the Naturalization Department knew of such 1929 letter to the German Foreign Office.

In 1932 he graduated from law school in Seattle. Shortly after he made a trip to Germany, returning to Seattle early in 1933. Later in 1933 he was one of the founders and the propaganda officer of the Seattle unit of the Friends of New Germany, which, pursuant to the stipulation hereinafter mentioned, was the Bund under the earlier name. Prior to such trip to Germany the defendant had not been at all active in German organizations but thereafter he became most active therein.

In July, 1935, the defendant and a few others organized the "German Society of Seattle". Immediately he resigned from the Friends of New Germany, his letter of resignation stating that such new society offered a more effective field of activity, that its purposes included all the original objectives of the Friends of New Germany and that it was contemplated that the various officers of such new society would be members of the Friends of New Germany,

which, he wrote, would guarantee the spreading of its spirit in Seattle.

Prior to the trial of this Giese case it was in written stipulation agreed by the parties, for the purpose of this case, in substance, that the Friends of New Germany was founded in this country in 1933 to forward German interests; that in 1936 its name was changed to the German-American Bund; that the Bund was merely the continuance under another name of the Friends of New Germany formed for German purposes and substantially controlled by Germany; that the Bund held that Hitler was the leader of all Germans within and without Germany, and taught the so-called blood philosophy, which was that blood is thicker than citizenship papers and that any one of German blood owed his first loyalty to Germany, regardless of citizenship. Under such stipulation it was agreed that the Bund was both un-American and subversive.

It should be stated here that the defendant in his testimony insisted that he had never known, until about trial time, of any un-American or subversive teachings and purposes of the Bund or of the Friends of New Germany, and that he had helped organize the Seattle unit in 1933 in all good faith.

In December, 1935, he wrote to an acquaintance of his 1932 trip to Germany with respect to an American member of the American team to the Olympic Games in Berlin, saying: "Another point is the political one. You probably are aware with what prejudices Americans arrive in the New Germany * * * I am doing my utmost here in matters of enlightenment, etc., but the damned newspapers and certain intellectual refugees, big scoundrels, all of them, poison the local public opinion." and requesting that such visitor be shown the New Germany, the letter ending: " * * * So you undoubtedly understand. Not too thick, but incidentally and thoroughly."

In 1936 the defendant made another trip to Germany, carrying with him a letter of the German Consul, who was a very active Nazi, to the Foreign Office in Berlin, in which letter it was said: "Mr. Giese plays a leading role among the German people in Seattle, * * * he has been especially active and with very fine success, in German political concerns, in explaining the New Germany. * * * Mr. Giese has expressed a wish to be placed in contact with leading authorities and personalities, who

could afford him a further insight in the organization of Germany on National-Socialistic lines, so that upon his return he can continue his work for the German people as the result of this greater knowledge."

In January, 1941, in a letter to Germany defendant stated that he recognized "* * * the possibilities of a disruption of diplomatic relations between this nation and Germany, the freezing of all foreign credits with simultaneous regulation of foreign exchange, and a system of permits probably connected with particular chicanery for German creditors, and perhaps in the final end an existence of a state of war."

On November 18, 1941, less than three weeks before Pearl Harbor, he wrote to the German Consul, among other things: "Yes, Consul, many things have changed here. The people are being inoculated with a war psychosis to the extent that it is a shame. * * * As long as there is freedom of speech we shall make use of it with our limited means."

From 1933 on the defendant made numerous speeches concerning Hitler, Nazi Germany and its program. His own notes and the translations of some of the speeches he made in German establish that he repeatedly before certain German audiences lauded Hitler and his program. Under the clear preponderance of the evidence he was closely associated with a small spearhead of Hitler and Nazi admirers in Seattle which was very active in attempting to control some important German organizations in Seattle in behalf of Hitler. The well executed plans of such small minority partly succeeded for a while although under the evidence at the trial the very great majority of the German people of Seattle were for the entire period thoroughly loyal to the United States and not at all favorable to Hitler.

Some time before Pearl Harbor the defendant purchased a considerable amount of German bonds and then still before Pearl Harbor invested a somewhat lesser amount in American defense bonds. Until Pearl Harbor he rendered much service for Nazi officialdom of a type in nowise called for by his legal business.

Immediately after Pearl Harbor he was questioned and investigated by the Federal Bureau of Investigation. Very soon he joined first aid classes of the Red Cross, became an air raid warden, and actively solicited buyers for American war bonds,

but the only war bonds he purchased after Pearl Harbor were bought shortly before his trial. Unquestionably his income during such period was much decreased.

In addition to the defendant's favor, beginning in 1933, of the Hitler regime and program in Germany he at the same time was active in other respects in a number of wholly non-German groups and therefore by a large number of thoroughly patriotic Americans was very naturally considered as a loyal American with no inclination for Hitler.

Most of the government's depositions show that the German-American Bund throughout America until Pearl Harbor carried on a carefully planned campaign in behalf of Hitler camouflaged by a carefully designed procedure of pretended American patriotism. Unquestionably, as shown by a very large number of his own private letters, the things the defendant himself favored and those he opposed were surprisingly similar to the commands and directions from time to time issued by the German-American Bund.

The government contends that such similarity was through concealed understanding with the Bund and was not merely coincidental.

Upon these facts the government argues that the defendant never wished citizenship except as it might be an aid to him in ingeniously furthering the aims of Germany; that his oath of allegiance in November, 1930, was entirely a sham and a fraud and that he was at heart 100% Nazi.

The opposing contention is that the defendant was always of such exceeding American patriotism that, in the words of his counsel, he deserved an "accolade" instead of denaturalization. The defense makes much of the defendant's love of the great outdoors, of his promotion of skiing among high school students, of his having married an American girl of Norwegian ancestry; that a Jew was the best man at his wedding in 1935; that he was an attorney of excellent reputation; that he purchased American bonds both before and after Pearl Harbor; attended Red Cross first aid classes and was an air raid warden.

The government counters that the defendant's purchase of war bonds, his connection with the Red Cross and his acting as air raid warden were anchors to windward; that he bought more German bonds and bought them first and that his other activities were to mislead many fine Americans and not through patriotism. With respect to the best man at the wedding the government submitted evidence and it was admitted that such particular individual had, before the wedding, attended several meetings of the Bund with the consent of the members thereof when it was designated "The Friends of New Germany."

Unquestionably when the defendant was naturalized in 1930 he then, under the evidence, had no allegiance to the Nazi cause or to Hitler. If the government is correct in its contention that in 1930 he secretly retained some German allegiance such must then have been to the Hindenburg regime and not to Hitler. The evidence directly relating to 1930 is very scant. If the 1930 naturalization is to be vacated it must be chiefly on inferences running backward from 1933 and later years. The substantial evidence is that prior to his late 1932 trip to Germany he and the German consul, for whom he had worked, were opposed to the Hitler movement.

Whatever the defendant may have said generally to many of his friends and casual acquaintances it is clear from his own personal notes, his many private letters and other written material of defendant, which necessarily are more convincing than human recollection, that by 1933 he had become so sufficiently indoctrinated by the Hitler movement as to have at the very least a divided loyalty.

The substantial preponderance of the evidence by virtue of such material in writing is quite compelling that of such divided loyalty his German Nazi patriotism beginning in 1933 until anyway Pearl Harbor flamed much the brighter.

Before this case was tried the District Court at Los Angeles in United States v. Bergmann, 47 F.Supp. 765, entered a decree of denaturalization against a defendant of German birth upon evidence of Nazi activity about equivalent in strength to that against the defendant, Giese. After the trial herein the Circuit Court in the Eighth Circuit in Baumgartner v. United States, 138 F.2d 29, affirmed the decision of the Missouri trial court (D.C., 47 F.Supp. 622) cancelling the naturalization of that defendant of German birth upon evidence of Nazi allegiance considerably stronger against the defendant, Baumgartner, as of the time of his naturalization and thereafter than against this defendant.

If the decision of the Los Angeles trial court in the Bergmann case and of the

Eighth Circuit Court of Appeals in the Baumgartner case had been affirmed such decisions would have justified a conclusion as to Mr. Giese's actual allegiance in 1930 based principally on evidence covering 1933 and succeeding years and would in such event have supported a decree as prayed for by the government herein.

■ But earlier this summer all nine justices of the United States Supreme Court in Baumgartner v. United States, 64 S.Ct. 1240, unanimously reversed the Baumgartner decree and held that to deprive one of citizenship after it had been bestowed the evidence must not only be clear, cogent and convincing but must be also unequivocal as of the time he took the oath. In such connection the highest court determined that the very strong evidence against Baumgartner was nevertheless not sufficient to meet such severe test. The United States Circuit Court of Appeals of this Circuit soon after, in Bergmann v. United States, 144 F.2d 34, upon the authority of the Supreme Court's ruling in the Baumgartner case, entered a reversal of the Los Angeles trial court in the Bergmann case, holding that since the evidence there was weaker than against the defendant, Baumgartner, the decree of denaturalization could not stand. The evidence against Hans Otto Giese is also weaker than that against Baumgartner and no stronger than that against Bergmann. This court is therefore bound and controlled by such decisions.

■ I am thus compelled by such decisions to hold that upon the grounds of fraud alleged in its complaint against Hans Otto Giese that the government must fail. Whatever degree of Nazi indoctrination occurred in 1933 it will not suffice under the recent decisions that control this court to cancel naturalization which preceded by three years any such conversion, partial or complete, to the Nazi cause.

As far as this case is concerned all of the depositions, concerning which ruling was reserved, are admitted. Considerable of such are of doubtful admissibility even in a trial where fraud is charged. But in cases involving allegations of fraud the courts have always held to substantial liberality in rulings on testimony and have let much in for what it might be worth, which in other types of trials would be excluded. However, under the controlling Schneiderman, Baumgartner and Bergmann decisions considerable of such evidence by deposition, while held admissible, is insufficient in weight or probative worth.

Another question, however, still remains. The government contends that defendant's letter of 1929 was an abandonment and can be construed no other way than that defendant then intended to enter German Foreign Service, to go to Germany to study for a while and then accept German diplomatic duty in the tropics or wherever he might be sent. The defendant's explanation of why he wrote such letter is not at all convincing. And several decisions of Judge Neterer submitted to this court indicate that if at the 1930 naturalization hearing he had known of such letter that the defendant would have then forthwith been denied American citizenship.

■ Judge Neterer in 1930 would have had a right upon such ground to have denied admission to citizenship to defendant. But Judge Neterer would not have been compelled then to deny the same. I am satisfied Judge Neterer in 1930 would have had the power to have held that the letter of 1929 was merely an inquiry and was not an abandonment of defendant's declaration of intention. If the German Foreign Office had offered defendant such an opportunity for foreign diplomatic service and defendant had then actually accepted very probably that would have been an abandonment. But under the Baumgartner and Bergmann rulings, supra, such letter of inquiry in 1929 could not suffice at this late date to cancel naturalization granted in 1930. I, therefore, have no authority to sustain the government on that ground.

■ Moreover, the government never alleged abandonment as a ground for cancellation of the defendant's citizenship. In the Schneiderman case the United States Supreme Court held in 1943 that in a matter so vital as denaturalization the court definitely should not consider a ground unless alleged in the complaint. In such decision the Supreme Court said [320 U.S. 118, 63 S.Ct. 1353, 87 L.Ed. 1796]: "* * * These issues are outside the scope of the complaint, * * *. Because they are outside the scope of the complaint we do not consider them. * * * A denaturalization suit * * * involves an important adjudication of status. Consequently we think the Government should be limited, as in a criminal proceeding, to the matters charged in its complaint."

Under the Schneiderman decision alone I must therefore disregard the question of abandonment. Under the later Baumgartner and Bergmann decisions in any event I would be compelled to the same conclusion since the evidence is not as strong against defendant on this issue as required by those controlling cases.

I am not holding that the evidence shows that the defendant in 1930 when he took his oath of allegiance to the United States did so in all good faith. I am not in any wise approving the things his own notes and letters show he did and said commencing in 1933. I am merely holding that the evidence is not so extremely strong against defendant as of that critical date in 1930 to authorize me under the aforesaid recent decisions to now cancel his citizenship.

The decisions by the appellate courts in such Schneiderman, Baumgartner and Bergmann cases were not in any sense approval of the things those defendants did or said. Such decisions were instead declarations that American citizenship is so extremely precious that no one having it through naturalization court decree should be later deprived thereof unless the evidence should be so exceedingly strong as to be unequivocal as of the actual time such one took the oath.

The Supreme Court in such late decisions makes it very clear that when the hearing is held upon an application for citizenship that the District Court is very free to, and should, deny the privilege at the hearing upon far less evidence than would have to be produced to cancel the certificate after it has issued. The Supreme Court says the time of admission is the time for careful scrutiny. It holds that before naturalization citizenship is a privilege which the court can and should withhold until affirmatively satisfied by evidence in petitioner's behalf. But if such a petitioner be admitted his citizenship becomes a right which the Supreme Court holds cannot be set aside except on extremely strong evidence against a defendant of his state of mind as of the date he was admitted.

Counsel, on notice, may present findings of insufficient evidence and decree of dismissal in conformity herewith.